## In re PONZI et al.

### (District Court, D. Massachusetts.   November 12, 1920.)

### Nos. 28063, 28072.

1. **Bankruptcy ⬤⟿91(2)—Evidence held to support referee's findings that respondents were not partners.**

   In involuntary bankruptcy proceedings against three respondents, alleged to be partners, evidence *held* to support the referee's finding that two of the respondents were not partners of the third, who had already been adjudicated a bankrupt, although the third had filed a certificate of partnership, which he testified was without the knowledge or consent of the supposed partners.

2. **Bankruptcy ⬤⟿98—Conclusions of referee entitled to weight.**

   In involuntary bankruptcy proceedings, the conclusions of the referee, who saw the witnesses and heard them examined, are entitled to much weight.

3. **Bankruptcy ⬤⟿91(2)—Evidence held not to show respondent was partner, notwithstanding his claim of partnership.**

   In involuntary proceedings in bankruptcy against two respondents, evidence *held* to sustain the referee's conclusion that one of the respondents was not a partner of the other, though he had recovered money in a suit in equity in the state court on the claim that he was a copartner.

In Bankruptcy.   Separate petitions for involuntary bankruptcy against Charles Ponzi, John S. Dondero, and one Bertollotti, as copartners, and against Charles Ponzi and Joseph Daniels, as copartners. Petitions dismissed as against all respondents, except Charles Ponzi.

The following is the opinion of Olmstead, Referee:

On the 9th day of August, 1920, an involuntary petition was filed in said court against Charles Ponzi individually.   To said petition an answer was filed by one Milton Benjamin, alleging a partnership consisting of said Ponzi, John S. Dondero and Guglielmo Bertollotti.   On August 12, 1920, a second petition was filed by said Milton Benjamin and other creditors against said alleged partnership.   On August 16, 1920, a third petition was filed against said Ponzi and one Joseph Daniels, alleging them to be partners.   These three petitions were specially referred to me to report and find the facts as to all issues raised by the pleadings.

The three issues to be considered are partnership, insolvency, and acts of bankruptcy.   It was admitted by counsel and I find that in all three petitions there existed creditors having claims in excess of $500, and that the principal debtor, Mr. Ponzi, owed more than $1,000.   On the issues of insolvency and acts of bankruptcy a jury trial has been claimed.   The issue of partnership may be determined by the court without a jury, and I proceed to consider this issue first.   I find the following facts:

About 18 years ago the respondent, Mr. Ponzi, an Italian formerly residing in Rome and Parma, Italy, came to this country.   While in Parma his landlord had been one Guglielmo Bertollotti, who was then about 70 years of age. Prior to December, 1919, Mr. Ponzi had been engaged in an import and export business, but with no great success.   During this month he decided to enter upon a new venture, and sought assistance from one Joseph Daniels, a fellow countryman, from whom he had previously purchased furniture.   He explained to Mr. Daniels the nature of his new business, and his reasons for his belief that it would be profitable.   He borrowed from Mr. Daniels $200 on a note which was subsequently paid at maturity.   Part of the proceeds of this note was used in the payment of his furniture, but a smaller portion was received by him in cash or check from time to time from Mr. Daniels.   I find that Mr.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Ponzi never agreed with Mr. Daniels that he would share any profits with him in his future business; his explanations being rather directed to assuring Mr. Daniels of the security of his loan, although Mr. Ponzi said that he was willing at all times to accept Mr. Daniels as an investor and to treat him like other investors.

The exact nature of the business was not disclosed in court by Mr. Ponzi, as whenever pressed on this point he raised his constitutional privilege against giving any testimony which might have a tendency to incriminate him. He did employ agents, who induced people to loan him money from time to time, with a promise in the notes issued therefor of a 50 per cent. profit at the end of 90 days. At first notes of different colors were issued for different denominations, but beginning in March, 1920, the series of notes thenceforth issued was of a yellow color.

On February. 24, 1920, a Mr. John S. Dondero, whose wife was an aunt or Mrs. Ponzi, had invested the sum of $2,000, which finally by repeated reinvestments increased to the sum of about $80,000, as evidenced by notes payable to his wife.

On December 26, 1919, Mr. Ponzi, without consulting counsel, filed a certificate in the city clerk's office, made out in his own handwriting, in compliance with chapter 539 of the Acts of 1907, the title of which is as follows: "An act relative to recording names and residences of persons engaged in or transacting business under names other than their own, either individually or as members of firms or partnerships." In this certificate Mr. Ponzi stated that he was the sole manager of the business which he had seen fit to conduct under the name of the Securities Exchange Company, and gave its place of business as 27 School street.

On March 12, 1920, he filed a similar certificate, made out in his own handwriting, in which he named John S. Dondero and Guglielmo Bertollotti as participants, and himself as manager. I am of the opinion that this statute, as its title would seem to indicate, was not intended to establish partnerships; the requirements of partnerships being regulated by other statutory enactments. I find, as testified by Mr. Ponzi, that his object in filing the second certificate was to forestall an attachment which he feared might be made by the Fidelity Trust Company, to which he was indebted. This apprehension appears to have been realized, for three days later a suit was brought by said trust company for a portion of its debt, which was subsequently satisfied July 14th, on execution.

The evidence clearly shows that Mr. John S. Dondero was an agent, receiving for moneys brought in and invested a commission of 10 per cent. He was authorized to employ subagents, with whom he divided his commissions, but who were not officially recognized by the Securities Exchange Company.

Up to April, 1920, Mr. Ponzi seems to have kept the accounts himself by a system of cards. In April he employed a Miss Meli, and later on, as the business grew to a great volume, there were employed about 30 in the office. He also had an office on Hanover street, next to the Daniels & Wilson Furniture Company, and later had an office in the building of the Hanover Trust Company, on the corner of Washington and Water streets. Miss Meli was his confidential clerk, and seems to have had pretty general charge of the business. She was a truthful witness, and testified that Mr. Dondero was an agent, and was at the office almost every day, occupying an outer room, however, and having no desk with Mr. Ponzi, who occupied the rear office. She had never heard Mr. Ponzi refer to Mr. Dondero as a partner, nor had she ever received any instructions from him, or heard him giving orders as a partner. Mr. Ponzi denied that Mr. Dondero and Mr. Bertollotti were his partners, and testified that his only object in filing the March certificate was to escape a possible attachment.

Mr. Dondero himself testified that he never was a partner, and, when he learned in July of the filing of the certificate in March, he protested to Mr. Ponzi, and Mr. Ponzi assured him that he would take his name off the certificate at the earliest possible date.

Counsel for the answering creditor in the first petition and for the petitioners in the second petition strenuously contended that the filing of the sec-

ond certificate amounted to a holding-out of Messrs. Dondero and Bertollotti, as partners; that it was in effect a partnership by conduct or estoppel. But such kinds of partnerships are not favored in bankruptcy. In Re Hudson Clothing Co. (D. C.) 148 Fed. 305, 307, Judge Hale says: "When federal courts have construed the law of partnership as it pertains to bankruptcy matters, 'they have held that a mere holding-out of partnership is not sufficient to warrant an adjudication; otherwise, a bankrupt might become liable to some creditors and not liable to others, and the proceedings in bankruptcy might be good as to some and void as to others. Partnership in fact must be actually proven in order to sustain an adjudication."

In Re Kenney (D. C. N. Y.) 3 Am. Bankr. Rep. 353, 360, 97 Fed. 554, 559, Judge Brown says: "The various provisions of section 5 of the Bankruptcy Act, as respects partners, show that it has reference to a partnership between the parties, * * * and not a partnership as to creditors only, without any possible joint estate."

The evidence also showed that in the month of June letters were written to the bank commissioner of the state of New Jersey, the Passaic National Bank, and the commissioner of corporations for the commonwealth of Massachusetts, in answer to inquiries as to the nature of the business, stating that the business was conducted under the name of the Securities Exchange Company by Mr. Charles Ponzi alone or as manager, that he was the sole owner, and that it was a one-man concern.

I find that Mr. Guglielmo Bertollotti, mentioned in the March certificate as of Parma, Italy, and who at this time would be nearly 90 years of age, was probably dead, and Mr. Ponzi testified that he believed he was dead when he put his name in the certificate. I accordingly find that this alleged partnership consisting of Mr. Dondero, Mr. Bertollotti, and Mr. Ponzi never existed.

The business, which was conducted by agents solely, continued to grow. There was no evidence adduced before me that Mr. Ponzi, who was the sole proprietor, ever conducted his business by circulars and by the use of the mails. What inducements were held out by agents to customers did not appear in the testimony, except so far as they were revealed by statements made by witnesses other than Mr. Ponzi. About March 12, 1920, Mr. Ponzi bought more furniture from Mr. Daniels. The latter testified that at the end of June he called on Mr. Ponzi and sought to sell him more furniture, stating that he had heard that he was making large sums of money and had "bought a swell house," and that he (Daniels) wanted some share in the profits which were assured him as a return for the favor he did Mr. Ponzi by his loan of $200 in December last. Mr. Ponzi denies that he ever had this interview, but Mr. Daniels says that when he got no satisfaction he went away and consulted his counsel, and that afterwards Mr. Isaac Harris was retained. On the 2d day of July a bill in equity was brought in the superior court, alleging that Mr. Daniels had advanced to Mr. Ponzi funds with which to conduct his business, and that he was entitled to one-half the profits of the business and the right to inspect the books, in which suit an attachment by mesne process was made in the sum of $1,000,000, and in fact deposits in various banks aggregating over half a million dollars were seized. Negotiations were subsequently had between July 2d and August 6th to dissolve the attachments by a bond. This result not having been attained, Mr. Ponzi sent word to Mr. Daniels, requesting an interview. Thereupon Mr. Daniels met Mr. Ponzi at his office in the building of the Hanover Trust Company on Washington street. A discussion took place as to the settlement of the suit. Mr. Ponzi was determined to settle it at any price, as his affairs were becoming desperate and he needed to release this large sum of money from attachment, in order that he might make payments, although he had ceased to take in money on the 26th of July by virtue of an arrangement with the state and federal district attorneys and the Attorney General of the commonwealth.

Mr. Daniels finally agreed to settle for $50,000. Mr. Ponzi immediately sent to the Hanover Trust Company and obtained $10,000 in cash and a certified check for $40,000 payable to Mr. Daniels. He and Mr. Daniels then

went to the Cosmopolitan Trust Company to secure the release of certain attachments; his counsel, Mr. Fowler, having prepared the papers therefor. At the Cosmopolitan Trust Company the bank officials were somewhat suspicious of the settlement in the absence of counsel; the name of Mr. Daniels' counsel appearing on the writ. It was arranged, therefore, that Mr. Harris should be notified, and he accordingly repaired to the bank. After some angry discussion between him and Mr. Ponzi, Mr. Ponzi stated that it was necessary to make a settlement with Mr. Harris in order to secure the release of the attachment, so the sum of $9,500 was paid to Mr. Harris in cash by Mr. Daniels, and an additional sum of $5,000 in cash was paid by Mr. Ponzi to Mr. Harris.

In Mr. Daniels' testimony before me he practically denied all the allegations of his bill in equity. He denied that he was a partner, or that he ever had or claimed the right to inspect the books. He had learned from agents and the newspapers of Mr. Ponzi's wonderful career and success, and my explanation of his conduct is that he thought he might as well get some of the profits himself, and used this pretext for so doing.

This whole transaction illustrates the possibilities of mesne attachments as they exist in New England and nowhere else. In Peck v. Jenness, 7 How. 612, 621, 12 L. Ed. 841, the Supreme Court of the United States says: "This species of process is peculiar to the New England States." Bond v. Ward, 7 Mass. 123, 128, 5 Am. Dec. 28; Bouvier's Law Dictionary (4th Ed.) sub. "Attachments," p. 163. The two latter authorities explain the history and origin of such attachments.

Mr. Ponzi denied that Mr. Daniels was in fact his partner. I accordingly find that this alleged partnership never existed.

As to insolvency and acts of bankruptcy, the petitioners allege that the respondent made transfers of his property during July to certain creditors mentioned, and to various other creditors whose names were unknown. I find as a fact that these transfers or payments were made as alleged, and constituted the acts of bankruptcy.

The issues are: "Was Mr. Ponzi at the time of the payments insolvent?" and "Did Mr. Ponzi intend to prefer these creditors?" Sufficient has been stated above to show that Mr. Ponzi's business consisted at that time of borrowing sums of money from investors at usurious rates of interest. It is to be observed in this connection that there is no law in Massachusetts against usury. Excepting a loan of less than $1,000, it is lawful to contract in writing for any rate of interest. R. L. c. 73, § 3; Id. c. 102, § 51.

While Mr. Ponzi is not to be classed in the same category with a robber and burglar, he was undoubtedly a clever manipulator, who took advantage of the credulity of the investing public, which in this instance is the usurer. The investors loaned their money for a return of the principal and 50 per cent. interest would seem themselves to be guilty of usury, if such existed. That Mr. Ponzi took advantage of a weakness and willingness of the community to be victimized is apparent, and sufficient to condemn his acts. So long as the current of money continued to flow in, he could pay the first investors with the receipts from the latter. It was another instance of robbing Peter to pay Paul, of which the past affords examples.

Mr. Edwin L. Pride and Mr. Charles F. Rittenhouse, public accountants, both testified that Mr. Ponzi had no regular business, that they could discover no source of profit, and that from the time of his venture in December down to the period of August 9th, when the petition was filed, he was at no moment solvent. This view was obtained from a careful inspection of his books and records. The great bulk of payments was made in July and August, when his assets and payments had reached millions. Both accountants stated that he had issued notes in excess of $14,000,000, and had made payments of about $9,000,000; that his outstanding liabilities, at or about the time of filing the petition, were $6,948,267.88. To meet this liability of nearly $7,000,000, Mr. Rittenhouse submitted a list of assets showing the grand total of $2,195,685.56. Mr. Ponzi in a statement in court tried to meet this situation by claiming that he had paid $9,500,000, instead of about

$8,000,000, stated by Mr. Pride; that there should be added to the $2,000,000 of assets reported by Mr. Rittenhouse about $1,000,000 more derivable largely from refunds of agents' commissions. I am inclined to place more reliance on the report of the accountants that the liabilities were nearer $7,000,000 than $3,000,000, which Mr. Ponzi claimed that he owed. In a statement to Mr. Pride, Mr. Ponzi had said that he could not raise more than $4,000,000, and that he was insolvent.

It is to be borne in mind that future maturities in bankruptcy become a present liability. The act provides, in section 63a (1), that among the debts of a bankrupt which may be proved and allowed is "a fixed liability, as evidenced by an instrument in writing, absolutely owing at the time of the filing of the petition against him, whether then payable or not." Hence future maturities under the bankruptcy system become fixed, provable liabilities on the filing of the petition. If this was the condition on the 9th of August, it is reasonable to infer that it related back to June, and that at the time the transfers and payments were made to the creditors Mr. Ponzi was actually insolvent.

In the receivers' examination Mr. Ponzi testified: "I never knew at any time how much I had in the banks exactly." During the month of July his funds in various banks were under attachment and his condition was growing desperate. The evidence also showed that he had deposits in other people's names. I therefore conclude that he was not only insolvent when he made these transfers or payments, but that he also knew that he was insolvent, and that the intent to prefer, as required by the statute to constitute an act of bankruptcy, is inferable from his act.

In Re McGee (D. C. N. Y.) 5 Am. Bankr. Rep. 262, 263, 105 Fed. 895, 896, Judge Coxe says: "It is a cardinal principle of law that every one is presumed to intend the necessary consequences of his acts, and where an insolvent debtor transfers a large portion of his property to one creditor, to the exclusion of all the rest, such a transaction must be taken as conclusive evidence of his intent to prefer that creditor."

In Toof v. Martin, 13 Wall. 40, 48 (20 L. Ed. 481), Mr. Justice Field says: "It is a general principle that every one must be presumed to intend the necessary consequences of his act. The transfer, in any case, by a debtor, of a large portion of his property, while he is insolvent, to one creditor, without making provision for an equal distribution of its proceeds to all his creditors, necessarily operates as a preference to him, and must be taken as conclusive evidence that a preference was intended, unless the debtor can show that he was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts. The burden of proof is upon him in such case, and not upon the assignee or contestant in bankruptcy."

I accordingly find that the allegations of all the petitioners as to insolvency and acts of bankruptcy have been fully sustained. The requests for rulings are covered by my report.

The case was ably argued by the learned counsel for all the petitioners and those opposing a partnership. I regret not to have been favored with any argument by counsel for the respondent Mr. Ponzi. Whatever may be the defects of my findings and conclusions, I feel I am justified in asserting that the volume of testimony adduced at the exhaustive hearings before me will be of great assistance to the future officials of this estate, should an adjudication be had, and the testimony, briefs of learned counsel, and exhibits are transmitted with my report.

Horblit & Wasserman, Arthur Berenson, and Martin Witte, all of Boston, Mass., for petitioners.

Samuel L. Bailen, of Boston, Mass., for Dondero.

Robert S. Nason, for Daniels.

Daniel V. McIsaac, of Boston, Mass., for Ponzi.

MORTON, District Judge. So far as Charles Ponzi individually is concerned, his claim to a jury trial has been waived, and there has been adjudication on the petition against him.

The present proceedings arise on two petitions, in the first of which Ponzi, Dondero, and Bertollotti are respondents, as copartners, and in the second of which Ponzi and Daniels are respondents, as copartners. The learned referee, to whom the matters were referred, has reported in favor of all the respondents, except Ponzi; and the present questions are whether his report should be confirmed, or whether as to some or all of the respondents, other than Ponzi, it should be set aside, and adjudication ordered.

[1] It is unnecessary to state all of the somewhat complicated facts. Speaking generally, there was nothing in the conduct of Ponzi's business which would indicate that it was a partnership. The auditors have found no indication on the books that he had any partners, and there is no evidence that any of the alleged copartners participated in the management and control of the business, or exercised any of the rights of a partner.

The case against Dondero and Bertollotti rests chiefly upon a certificate filed by Ponzi under the act of 1907 (St. Mass. c. 539). In it he stated explicitly that he, Dondero, and Bertollotti were the persons carrying on the business. Neither Dondero nor Bertollotti signed this certificate; as appears from its face, it was made by Ponzi alone. He testified that he was never authorized to do so by Bertollotti or Dondero, and that neither of them knew anything about the certificate at the time, or was a partner. This testimony is corroborated by Dondero. As to Bertollotti, there is practically no evidence, except Ponzi's testimony. He says that Bertollotti was a real person, who had been his landlord in Italy, who would now be about 90 years of age, if living, and whom he supposed to be dead; that Bertollotti knew nothing about the use of his name, nor about Ponzi's business. On this testimony, Bertollotti's name, as used by Ponzi on the certificate, was in effect a fictitious one.

[2] It is contended by the petitioning creditors that the established facts show that Dondero, at least, was a partner, and require the rejection of the contrary testimony of Ponzi and Dondero. But the learned referee, who saw the witnesses and heard them examined at much length, believed that on the point under discussion they were telling the truth. His conclusions are entitled to much weight, and the facts relied on by the petitioners are by no means so cogent and convincing as to satisfy me that the learned referee was wrong. I think that the evidence as a whole supports the referee's conclusions that Ponzi's certificate did not state the facts, and was a false and fraudulent statement, made for the purpose of avoiding attachment on mesne process, and that neither Dondero nor Bertollotti were partners of Ponzi.

[3] As to the petition against Daniels: There is no doubt that Daniels lent Ponzi a small sum of money near the inception of the enterprise. Daniels made a claim under oath in his bill in equity against Ponzi in the state court that he was in effect a partner, and

be accepted in settlement of that claim a large sum of money. It does not appear that Ponzi ever acquiesced in the claim. He paid the money; but his purpose in doing so appears to have been to free his funds from the large attachment on mesne process by which they had been tied up. Daniels never conducted himself as a partner, and there is nothing in Ponzi's testimony or in his conduct which indicates that he believed Daniels to be his partner. The testimony of Daniels is, of course, worthless; but the testimony of Ponzi on this issue is not affected by such inconsistency, interest, and suspicion as that of Daniels. The learned referee believed that Ponzi was telling the truth about it; and there is nothing in the established facts or in the transcript of the testimony which, in my opinion, would justify holding that the learned referee was in error in this respect. Between the alternatives that Daniels was a partner in the enterprise, and that, not being a partner, he falsely claimed to be one, I agree with the learned referee that the latter is more probable. It is possible that there may have been an agreement between Ponzi and Daniels of such character and breadth as to constitute Daniels a partner by operation of law; but it seems to me that the learned referee was clearly right in holding, as in effect he did, that there was no sufficient proof of such an agreement.

The report of the learned referee seems to me to be a fair and able decision of the questions referred to him; and it is confirmed.

Let decrees be entered, dismissing both petitions, with costs.