In re INDEPENDENT CLEARING
HOUSE COMPANY, a
Trust, Debtor.

In re UNIVERSAL CLEARING HOUSE
COMPANY, a Trust, aka National
Clearing House Company, a Trust,
Debtor.

In re ACCOUNTING SERVICES
COMPANY, a Trust, Debtor.

Robert D. MERRILL, Trustee,

v.

David ABBOTT, et al., Defendants.

Bankruptcy Nos. 81A–02886,
81A–02887 and 81A–03704.
Adv. No. 83PA–0986.

United States Bankruptcy Court,
D. Utah.

Aug. 6, 1984.

William G. Fowler and Michael N. Zundel, Roe, Fowler & Moxley, Salt Lake City, Utah, for trustee.

Daniel W. Jackson and Jeffrey W. Wilkinson, Bradley, Arrowsmith & Jackson, Salt Lake City, Utah, for 322 defendants.

Gary A. Frank, Murray, Utah, for 238 defendants.

Richard H. Casper, Ray, Quinney & Nebeker, Salt Lake City, Utah, for Briant H. Summerhays.

Jeffrey C. Zimmerman, Fabian & Clendenin, Salt Lake City, Utah, for Sur. Nat. Bank.

Edwin F. Guyon, Guyon & Guyon, Salt Lake City, Utah, for David Ashby.

Kathleen M. Nelson, Bountiful, Utah, for Fern Moser and Ron Schooley.

William B. Parsons III, Pace, Klimt, Wunderli & Parsons, Salt Lake City, Utah, for American Factoring and Edward and Mark Lemmon.

Don L. Bybee, Salt Lake City, Utah, for Fred and Elaine Kennedy.

Richard F. Bojanowski, Salt Lake City, Utah, for David L. Barfuss Family Trust, Carl and Susan Benson and Marian L. Benson.

Joseph C. Fratto, Jr., Salt Lake City, Utah, for Harry B. Young and Johnson & Brown.

George H. Mortimer, Provo, Utah, for C. Dean Packer.

Dale F. Gardiner, Salt Lake City, Utah, for David and Nancy Herbert, and Antje and Hilkina Thompson.

Claude C. Richards, Provo, Utah, for Joseph E. Wood.

Clinton Williams, pro se.

## MEMORANDUM OPINION

JOHN H. ALLEN, Bankruptcy Judge.

### INTRODUCTION

An unusual situation is presented in this proceeding. These are two thousand adversary complaints filed by the trustee against investors in a "Ponzi" scheme to recover alleged preferences and fraudulent

conveyances.[1] The proceedings were consolidated for trial by order of this Court. Defendants contend that the funds sought to be recovered by the trustee were impressed with a constructive trust in their favor and never became property of the debtors' estate, and thus are not recoverable by the trustee.

## BACKGROUND

■ Independent Clearing House Company and Universal Clearing House Company filed petitions for relief under Chapter 11 of the Bankruptcy Code on September 16, 1981. Accounting Services Company filed a Chapter 11 petition on December 17, 1981. On April 29, 1982, an order for relief was granted against Tonder Payable Service Company, and on August 16, 1982, against Payable Accounting Company. Each of the five related debtor entities was created as a "Massachusetts" or business trust, domiciled in the Grand Cayman Islands, British West Indies.[2]

On September 25, 1981, the Court appointed Dr. Ron N. Bagley, a certified public accountant and professor in the Business Department of the University of Utah, trustee pursuant to 11 U.S.C. § 1104. On October 1, 1981, the Court authorized Dr. Bagley to serve as his own accountant on the case. On October 26, 1982, Bagley resigned as trustee and Robert D. Merrill was appointed successor trustee.

Immediately following the filing of the bankruptcy petitions, the F.B.I., pursuant to a search warrant, seized many of the debtors' business records.[3] On May 11, 1983, a Federal Grand Jury for the District of Utah returned a sealed indictment charging 21 persons connected with the operation of the Clearing Houses with various crimes, including wire fraud, mail fraud, interstate transportation of money obtained by fraud, bankruptcy crimes, and racketeering.[4] The indictment alleges that the principals of the debtors engaged in a massive "Ponzi" scheme in which funds deposited by later investors were utilized to pay "interest" to previous investors.[5] Tri-

1. Adversary Proceeding Nos. 83PA–0986 through 83PA–3079 (filed Sept. 15, 1983).

2. The co-trustees of Independent Clearing House, as they appear in various documents and records on file in this case, are Olney Ebanks, an individual residing in the Grand Cayman Islands, and Hardcastle and Company, a trust domiciled in Belize City, Belize. The co-trustees of Universal Clearing House are Altona Ebanks, the wife of Olney Ebanks, and Biderman and Company, a trust domiciled in Belize City, Belize. See Affidavit of Richard T. Cardall (Nov. 12, 1981); Trustee's Consolidated Disclosure Statement at 7–8 (Dec. 27, 1983). None of the trustees or their representatives have entered an appearance in these bankruptcy cases.

A "Massachusetts" or business trust, also known as a "common law" trust, is essentially a business organization case in trust form. It originated in Massachusetts to circumvent that state's former prohibition against corporations dealing in real estate. Such a business enterprise usually involves an arrangement whereby property is conveyed to trustees in accordance with a trust instrument, to be held for the benefit of individuals holding transferable certificates issued by the trustee showing the shares into which the beneficial interest is divided. The certificates entitle the holder to share ratably in the income of the property and, upon termination of the trust, in the proceeds. Un-

like an ordinary trust, the object of the "Massachusetts" or business trust is not to hold and conserve particular property, but to provide a medium for the conduct of business and the sharing of gains. See Annot., *Massachusetts or Business Trusts*, 156 A.L.R. 22 (1945); Annot., *Modern Status of Massachusetts or Business Trusts*, 88 A.L.R.3d 704 (1978); Wrightington, "Voluntary Associations in Massachusetts," 21 Yale L.J. 311–329 (1912). See also In re Armstead & Margaret Wayson Trust, 29 B.R. 58, 59, 8 C.B.C.2d 677, Bankr.L.Rep. ¶ 69,043 (Bkrtcy.D. Md.1982); In re Treasure Island Land Trust, 2 B.R. 332, 5 B.C.D. 1246, 1 C.B.C.2d 407 (Bkrtcy. M.D.Fla.1980).

For the purpose of eligibility for debtor relief, the "Massachusetts" or business trust is a legal entity which falls within the Code's definition of a corporation. See 11 U.S.C. § 101(8)(A)(v).

3. *United States v. Richard Taylor Cardall, et al.,* No. CR83–00065A, slip op. (D. Utah March 14, 1984), *motion for reconsideration granted* (July 9, 1984).

4. *United States v. Richard Taylor Cardall, et. al.,* No. CR83–00065A. A superseding indictment was handed down on October 26, 1983.

5. This case has been much written about in the local and national press. See e.g., Drinkhall, "How Farm Town Bore Brunt of Alleged Fraud

als in the criminal cases are presently pending.

In late June of 1980, the debtors ran into trouble. The securities commissions in several states had issued orders enjoining them from soliciting investments.[6] No business was being conducted by the debtors at the time of filing their bankruptcy petitions, and none has been conducted by the trustee. Rather, the trustee has determined that the primary assets of the debtors' estate consist of various legal claims against individuals and entities to whom funds of the debtors were allegedly diverted.[7]

On May 10, 1984, the Court entered its order confirming the trustee's plan of reorganization. The plan provides for the substantive consolidation of the debtors, liquidation of all their assets, and a distribution on a periodic basis to all claimants in accordance with the priorities under the Bankruptcy Code.[8]

On September 15, 1983, within two years after the appointment of a trustee, these proceedings were commenced to recover funds paid by the debtors to their investors.[9]

■■■ The complaint sets forth three principal causes of action.[10] The first

by a Factoring Outfit," Wall St.J., November 28, 1983, at 1, col. 1 (West. ed.); Stern, "Investment Scams: Happy Hunting in Salt Lake City," Forbes, June 20, 1983, at 33–34; Buxton, "Utah Suffers an Epidemic of Swindles," Los Angeles Times, May 16, 1983; Wadley, "Fraud: A Lot of Utahns are Getting Burned in One Way or Another," Deseret News, April 29, 1982, at C–1, col. 1; Wadley, "Fraud: Why Are Utahns so Susceptible to Scams?" Deseret News, April 20, 1982, at C–1, col. 1; Del Porto, "Story of $32 Million Hunt Unfolds in Bankruptcy Court," Deseret News, November 1, 1983, at B–2, col. 1; Seldin, "Complex Dealings Surround Fraud Charges," Salt Lake Tribune, May 30, 1983, at B–1; Del Porto, "3,800 Victims of Scam May Never Recover Funds," Deseret News, May 18, 1983, at B–1; Udevitz, "5,000 Investors Out Millions, Record Show," Denver Post, November 26, 1981.

6. *In re Independent Clearing House and Universal Clearing House,* Nos. 81–02886, 81–02887, slip op. at 3 (Nov. 15, 1982).

7. *See* Trustee's Consolidiated Disclosure Statement, at 24 (Dec. 27, 1983). The following adversary proceedings arising in or related to the Clearing House cases are presently pending in this court: *Merrill v. Chad Allen, et al.,* No. 82PA–0253; *Merrill v. Maurice Anderson's Men's Shop, et. al.,* No. 83PA–3082; *Merrill v. Theodore Ayervais, et al.,* No. 83PA–3081; *Merrill v. Charles Bissell,* No. 83PA–3100; *Merrill v. Kenyon Blackmore,* No. 83PA–3106; *Merrill v. Richard Cardall, et. al.,* No. 82PA–0246; *Merrill v. Eugene Davis,* No. 82PA–0874; *Merrill v. Lester Decker, et. al.,* No. 83PA–3104; *Merrill v. Thomas Dietz,* No. 83PA–3105; *Merrill v. Gerald Lee Eastman,* No. 83PA–3084; *Merrill v. Excita Petroleum Corp.,* No. 83PA–3103; *Merrill v. L.W. Frandsen, et. al.,* No. 83PA–3109; *Merrill v. Gold N' Green Mining, et. al.,* No. 83PA–3099; *Merrill v. John Heredia, et al.,* No. 83PA–3086; *Merrill v. Allen E. Hovenden, et. al.,* No. 83PA–3102; *Merrill v. Lemco Corp., et al.,* No. 83PA–3017; *Merrill v. Ram Oil and Gas, et al.,* No. 83PA–0846;

*Merrill v. Stanley L. Willmitt, et al.,* No. 83PA–3085; *Merrill v. Newton Taylor, et. al.,* No. 82PA–0271; *Merrill v. Gerald Turner, et. al.,* No. 83PA–3083.

8. *Cf. In re Coastal Equities, Inc.,* 33 B.R. 898, 11 B.C.D. 62 (Bkrtcy.S.D.Cal.1983) (bankruptcy court confirmed trustee's liquidating plan of reorganization of debtor which had operated a "Ponzi" scheme).

9. Section 546(a) of the Code, which establishes a statute of limitations for the use by the trustee of his avoiding powers, provides:

(a) An action or proceeding under section 544, 545, 547, 548 or 553 of this title may not be commenced after the earlier of—
(1) two years after the appointment of a trustee under section 702, 1104, 1163, or 1302 of this title; and
(2) the time the case is closed or dismissed.

10. A bankruptcy trustee is not bound to pursue every cause of action, and may properly decide that the speculative nature of the suit and the expense involved do not warrant prosecution. *Meyer v. Fleming,* 327 U.S. 161, 165–167, 66 S.Ct. 382, 385–386, 90 L.Ed. 595 (1946). The trustee should "make the choice which is most advantageous to the estate." *Id.* at 168, 66 S.Ct. at 386. *See* 4A COLLIER ON BANKRUPTCY ¶ 70.42, at 502 (14th ed.1978). *Cf. In re Harper,* 175 F. 412, 428–29 (N.D.N.Y.1910) ("Trustees in bankruptcy are not justified in rushing the estates of bankrupts into doubtful or unproductive litigation. It is not their privilege to use the estates committed to their charge to settle questions of law which may arise. If success is doubtful in the case of a claim alleged to be due the estate and the fruits of success will not pay the expense of cultivating the field, it is their duty as a general rule, to abandon the claim, unless the creditors, or a substantial majority of them, desire the litigation to proceed."); *In re Fluharty,* 7 B.R.

cause of action alleges that the debtors' payments to investors within 90 days of the filing of their bankruptcy petitions constitute preferential transfers. The second cause of action alleges that certain defendants received more than they deposited with the debtors and this "profit" constitutes a fraudulent conveyance. The trustee's third cause of action alleges that *all* payments made to investors constitute fraudulent conveyances and may be recovered for a pro-rata distribution. The trustee also seeks an allowance of prejudgment interest at the legal rate from the date of the transfers.

On February 24, 1984, the trustee filed a motion for summary judgment supported by the affidavit of his accountant, Dr. Ron N. Bagley, and a memorandum of points and authorities. The trustee further moved the Court, in conjunction with his motion for summary judgment, for leave to amend his complaint to conform to the proof offered in the affidavit of his accountant.[11] Thereafter, various defendants filed responses and cross-motions for summary judgment. Oral argument was presented on March 29, 1984, and the matter was taken under advisement.

## UNDISPUTED FACTS

While many details are missing and may never be known, the critical facts, as they appear from the pleadings, answers to interrogatories, together with the affidavit of the trustee's accountant, are clear and uncontroverted. The uncontroverted facts as set forth in the affidavit of the trustee's accountant may be stated as follows:

(1) Independent Clearing House Company and Universal Clearing House Company filed petitions for relief under Chapter 11 of the Bankruptcy Code on September 16, 1981.

(2) The stated business purpose of the debtors was to solicit funds from private investors, who were characterized as "undertakers," and to use the invested funds for the purpose of assuming and paying the accounts payable of various client companies. Profits were to be obtained, which represented the difference between discounts negotiated with the creditors of the

---

677, 680, 6 B.C.D. 1417 (Bkrtcy.N.D.Ohio 1980) ("To justify the incurrence of expense on [the] part of the trustee in pursuing a cause of action, a sufficient prospect of recovery must exist.") The trustee may, in his best judgment, compromise, settle, or abandon legal claims. In this case, the trustee might have abandoned his causes of action against these investors and sought an appropriate reduction of their claims as an offset. *See Page v. Rogers*, 211 U.S. 575, 581, 29 S.Ct. 159, 161, 53 L.Ed. 332 (1909) (approving procedure of determining the amount of the dividend to which a preferred creditor would be entitled, and deducting therefrom the amount which he is compelled to surrender, thereby avoiding "the circuitous proceeding of compelling the defendant to pay into the bankruptcy court the full amount of the preference which he has received, and then resort to the same court to obtain part of it back by way of a dividend.") *Cf. In re Gander Mountain, Inc.*, 29 B.R. 260, 265 (Bkrtcy.E.D.Wis.1983) (rule of *Page v. Rogers* limited to instances where the preferred creditor is entitled to receive a dividend, the dividend can be quickly and easily determined, and the dividend is immediately payable); *In re Balducci Oil Company*, 33 B.R. 843, 847 (Bkrtcy.D.Colo.1983) (declining to apply rule of *Page v. Rogers* in complex bankruptcy case where dividend calculation could not easily be determined and was not readily payable). I hasten to add that this admonition is not intended in any way to deprecate the valuable and conscientious services of the trustee in this case or to second guess his litigation decisions. *Cf. In re Curlew Valley Associates*, 14 B.R. 506, 511–14, 8 B.C.D. 495, 5 C.B.C.2d 255 (Bkrtcy.D.Utah 1981). A trustee ought to be free to pursue whatever reasonable quest his investigation may lead him to think it wise to follow. *Willcox v. Goess*, 22 F.Supp. 841, 844 (S.D.N.Y.1938).

**11.** An amendment to conform to the evidence may be made at any time. Rule 15(b), Fed.R. Civ.P. The trustee's motion for leave to amend his complaint is addressed to the discretion of the court. The test for allowing an amendment to the pleadings under Rule 15(b) is whether the amendment would prejudice the adverse party. 3 J. Moore, MOORE'S FEDERAL PRACTICE ¶ 15.13[2], at 15–172 to 15–173 (2d ed. 1984). In the present case, the trustee asks to amend his complaint solely to change the amounts sought to be recovered under his three causes of action to conform to the figures shown in the affidavit of his accountant. No objection on the ground of unfair surprise was made. I shall therefore grant leave to amend in accordance with the trustee's motion.

client companies and the sums repaid by the client companies.

(3) Commencing in 1980, the debtors began soliciting investments from private investors through sales agents.

(4) The investor contracts provided in part that:

(a) The investor will commit to the debtors a specified sum of cash, credit or commodities which may be hypothecated;

(b) The debtors may use the funds committed to pay the debts of their clients;

(c) The funds are committed for a period of nine months, at which time the principal amount will be returned;

(d) During the nine months, investors may elect to receive fixed monthly interest to be paid by the tenth of each month, or to be paid interest in one payment at the end of the nine-month period;

(e) The investor may cancel his commitment by giving written notice thirty days prior to cancellation, in which event the investor shall receive interest at a specified reduced rate;

(f) The funds committed remain under the custody and control of the Clearing Houses, which warrant that they will at all times have sufficient cash, the right to revenue from client companies, or other collateral equal to the investor's funds.

(5) Investors also signed a document styled "Commitment to Assume Debt," which sets forth the details of how their funds are to be committed to the debtors.

(6) In 1980 and 1981, thousands of investors deposited sums totaling more than 29 million dollars with the Clearing Houses.

(7) Until the investment program collapsed in July-September, 1981, investors received contractual returns of $84.00 per month per $1,000.00 invested.

(8) No client companies existed whose accounts payable were paid by the debtors in accordance with the program as represented to investors, and no profits or earnings were ever produced by the purported accounts payable program.

(9) The only source of funds for the debtors were investments of "undertakers."

(10) All of the monthly payments made to investors were paid from other "undertaker" investments.

(11) The debtors were insolvent from the moment of the execution of the first investor contract, and became more insolvent with each successive contract.

(12) The business of the debtors was conducted as a "Ponzi" scheme in which fictitious profits were paid to investors from the principal sums deposited by subsequent investors.[12]

---

**12.** A "Ponzi" scheme, as that term is generally used, refers to an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors. Affidavit of Ron N. Bagley in Support of Trustee's Amended Motion for Summary Judgment ¶ 20 (February 24, 1984). *See Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *United States v. Rasheed,* 663 F.2d 843 (9th Cir.1981), *cert. denied* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *Rosenberg v. Collins,* 624 F.2d 659 (5th Cir.1980); *United States v. Cook,* 573 F.2d 281 (5th Cir.1978); *In re Tedlock Cattle Company,* 552 F.2d 1351 (9th Cir.1977); *Matter of Freudmann,* 495 F.2d 816 (2d Cir.1974); *In re Diversified Broker's Company, Inc.,* 487 F.2d 355 (8th Cir.1973); *Conroy v.*

*Shott,* 363 F.2d 90 (6th Cir.1966); *Boyle v. Gray,* 28 F.2d 7 (1st Cir.1928), *cert. denied,* 278 U.S. 653, 49 S.Ct. 178, 73 L.Ed. 563 (1929); *Gallagher v. Hannigan,* 5 F.2d 171 (1st Cir.), *cert. denied,* 269 U.S. 573, 46 S.Ct. 101, 70 L.Ed. 425 (1925); *Guy v. Abdulla,* 57 F.R.D. 14 (N.D.Ohio 1972); *In re Moore,* 39 B.R. 571 (Bkrtcy.M.D.Fla.1984); *In re Coastal Equities Inc., supra,* note 5; *People v. Luongo,* 47 N.Y.2d 418, 418 N.Y.S.2d 365, 391 N.E.2d 1341 (Ct.App.1979). *See also,* A. Leff, Swindling and Selling 70–72 (1976).

In the pantheon of crime, Charles Ponzi, the eponymous architect of the "Ponzi" scheme, enjoys a place of prominence. Ponzi began in December, 1919, with $150.00 in capital, borrowing money on his promissory notes. Ponzi represented that he could take advantage of the differences in currency exchange rates following World War I by purchasing international postal reply coupons in foreign countries with weak currencies and redeeming them in countries with strong currencies at 100 percent prof-

(13) The defendants in these adversary proceedings are investors of Independent Clearing House and/or Universal Clearing House.

(14) Those who invested with Independent Clearing House and/or Universal Clearing House consist of three general groups:

 (a) Those who invested early, or who cancelled their commitment prior to the end of the nine-month period, and were fully repaid together with fictitious profits;

 (b) Those who received some payments but also realized net losses on their investment; and

 (c) Those who invested late and received no return from their investment.

(15) The investors who did not withdraw their funds received approximately the percentage of return on their investments shown in the following table:

| Date of Investment | Return |
| --- | --- |
| October, 1980 | 76% |
| November, 1980 | 60% |
| December, 1980 | 54% |
| January, 1981 | 44% |
| February, 1981 | 34% |
| March, 1981 | 27% |
| April, 1981 | 21% |
| May, 1981 | 3% |
| June, 1981 | 0% |
| July, 1981 | 0% |
| August, 1981 | 0% |
| September, 1981 | 0% |

(16) The last monthly payments made to investors pursuant to their "undertaker" contracts were made by check and occurred on or after July 10, 1981.

(17) The investors who received payments on or after July 10, 1981 executed "undertaker" contracts more than 45 days before such payments.

(18) Approximately 924 investors, who deposited more than four million dollars with the debtors after June 12, 1981, received no returns and lost all of their original investments.

These are the undisputed facts of this proceeding to which the Court must apply the controlling principles of bankruptcy law. The parties disagree little as to the controlling facts, but vigorously disagree as to the legal consequences of those facts. In order to prevail, the trustee must advance a viable legal theory under the undisputed facts that would entitle him to judgment as a matter of law.

### DISCUSSION

*Summary Judgment*

■ Rule 56 of the Federal Rules of Civil Procedure is made applicable to adversary proceedings by Rule 7056 of the Bankruptcy Rules. In determining whether to grant a motion for summary judgment, the

---

it. Ponzi offered to share this profit with investors, who were promised a 50 percent return on 45 day notes. Ponzi actually made no investments of any kind, and all of the money he had at any time was the result of the loans made by investors.

Ponzi issued notes in excess of 14 million dollars, and made payments of about 9 million dollars to his investors. On August 1, 1920, a Boston newspaper exposed Ponzi as a charlaton, and there was a wild scramble by investors to present their notes for payment. On August 9, 1920, an involuntary petition in bankruptcy was filed against Ponzi. At the time the petition was filed, Ponzi's outstanding liabilities were $6,948,267.88, and his total assets were $2,195,685.56. Ponzi refused to disclose to the referee the nature of his business, and whenever questioned on the point invoked his fifth amendment privilege against self-incrimination. But from a careful examination of Ponzi's books

and records, accountants established that he had never engaged in a regular business, that no source of profit existed, and that he was insolvent from the inception of his venture.

Ponzi was sentenced to prison, from which he was paroled after three and one-half years. He was re-arrested in Florida and sentenced to jail for a real estate fraud in which investors were promised 200 percent profit in sixty days. After serving seven years imprisonment, he was deported to Italy, where Mussolini gave him a job in the finance ministry. Ponzi left Italy for South America, and ultimately died penniless in a charity ward in Rio de Janeiro. *See Cunningham v. Brown, supra,* 265 U.S. at 7–9, 44 S.Ct. at 425–426; *In re Ponzi,* 268 F. 997 (D.Mass.1920); J. Nash, Bloodletters and Badmen 448–51 (1973); Train, "Mr. Ponzi and His Scheme," Harvard Magazine, May-June 1984, at 12–16; "Take My Money," Time, January 31, 1949, at 21.

task of the Court is to examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, and ascertain if a genuine issue of material fact exists. If there is none, it is the Court's duty to apply the law to the undisputed facts and render judgment.

In making its determination, the Court shall apply familiar and settled principles of summary judgment law. The Court notes at the outset that summary judgment is a drastic remedy and should be invoked cautiously. *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir.1977); *Redhouse v. Quality Ford Sales, Inc.*, 511 F.2d 230, 234 (10th Cir. 1975); *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir.1973); *Ando v. Great Western Sugar Co.*, 475 F.2d 531, 535 (10th Cir. 1973); *Machinery Center, Inc. v. Anchor National Life Insurance Co.*, 434 F.2d 1, 6 (10th Cir.1970). Pleadings and documentary evidence will be liberally construed in favor of the party opposing the motion. *Machinery Center, Inc., supra*, 434 F.2d at 6; *Zampos v. United States Smelting and Refining and Min. Co.*, 206 F.2d 171 (10th Cir.1953). The Court will consider factual inferences as tending to show triable issues of material fact in the light most favorable to the existence of such issues. *Houghton v. Foremost Financial Services Corp.*, 724 F.2d 112, 114 (10th Cir.1983); *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.1975); *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168, 171 (10th Cir.1974). *See Bruce v. Martin Marietta Corp.*, 544 F.2d 442, 445 (10th Cir.1976); *Frackowiak v. Farmers Insurance Co.*, 411 F.Supp. 1309, 1312 (D.Kan.1976); *Taylor v. Beech Aircraft Corp.*, 407 F.Supp. 69, 72 (D.Okla.1976). Furthermore, summary judgment must be denied unless the moving party demonstrates his entitlement to it beyond a reasonable doubt. *Bankers Trust Co. v. Transamerica Title Insurance Co.*, 594 F.2d 231, 235 (10th Cir.1979); *Mogle v. Sevier County School Dist.*, 540 F.2d 478, 482 (10th Cir.1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977); *Wirtz v. Young Electric Sign Co.*, 315 F.2d 326, 327 (10th Cir.1963); *Hernandez v. United States*, 465 F.Supp. 1071, 1073 (D.Kan.1979); *In re Richardson*, 23 B.R. 434, 443, 9 B.C.D. 895 (Bkrtcy.D.Utah 1982).

The burden on the party opposing summary judgment is not a heavy one; he simply is required to show specific facts, as opposed to general allegations, that present a genuine issue for trial. *See Coleman v. Darden*, 595 F.2d 533, 536 (10th Cir.), *cert. denied*, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979).

Under Rule 56, the Court upon motion by one party for summary judgment has the power to grant summary judgment against the moving party and in favor of the non-moving party, although the latter has not filed a cross-motion for summary judgment. *Procter & Gamble Independent Union v. Gamble Mfg. Co.*, 312 F.2d 181, 190 (2nd Cir.1962), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1872, 10 L.Ed.2d 1053 (1963); *Factora v. District Director of U.S. Immigration & Nat. Service*, 292 F.Supp. 518, 521 (C.D.Cal.1968); *National Savings and Trust Co. v. Sarolea*, 269 F.Supp. 4, 7 (D.D.C.1967).

The party opposing summary judgment does not have a duty to present evidence in opposition to the motion in all circumstances. However, if the movant makes out a prima facie case that would entitle him to a directed verdict if uncontroverted, summary judgment will be granted unless the party opposing the motion offers some competent evidence that could be presented at trial showing that there is a genuine issue as to a material fact. 10A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE § 2727, at 143 (2d ed. 1983). Stated differently, where the moving party has supported his motion for summary judgment by affidavit, the opposing party cannot rest on the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Baum v. Gillman*, 648 F.2d 1292, 1297 (10th Cir.1981);

*Security National Bank v. Belleville Livestock*, 619 F.2d 840, 846–47 (10th Cir.1979); *Brown v. Chaffee*, 612 F.2d 497, 504 (10th Cir.1979); *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 873 (5th Cir.1978); *Stevens v. Barnard*, 512 F.2d 876, 878 (10th Cir.1975); *Gates v. Ford Motor Company*, 494 F.2d 458, 460 (10th Cir.1974); *Ando v. Great Western Sugar Co.*, *supra*, 475 F.2d at 535. The mere allegation of a factual dispute is not enough to overcome a convincing presentation by the moving party. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). If the party against whom summary judgment is sought comes forth with affidavits which create uncertainty as to the true state of any material fact, summary judgment must be denied. *In re Iota Industries*, 33 B.R. 49, 51 (Bkrtcy.S.D.N.Y.1983). *Cf. California Shipping Co. v. Pacific Far East Line, Inc.*, 453 F.2d 380, 381 (9th Cir.1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1501, 31 L.Ed.2d 796 (1972) (vague memorandum not sufficient evidence to create a genuine issue of fact).

Most courts have recognized that a complex but undisputed fact situation will not bar summary judgment. 10A FEDERAL PRACTICE AND PROCEDURE, *supra* § 2732, at 306. In view of the fact that defendants did not attempt to obtain the deposition of the trustee, his accountant, or others, and did not submit counter-affidavits which might raise a genuine issue of material fact, they are in a poor position to resist the summary judgment motion on the ground that this case is based on a complex scheme to defraud and does not lend itself to disposition by summary judgment. *See Securities and Exchange Commission v. Geyser Minerals Corp.*, 452 F.2d 876, 880 (10th Cir.1971).

An affidavit by a witness may be countered by affidavits showing that the witness is biased or otherwise unreliable, but in putting an affiant's credibility in issue, specific facts must be presented. *Lundeen v. Cordner*, 354 F.2d 401 (8th Cir.1966). If the credibility of the movant's affiant is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment is not warranted. 10A FEDERAL PRACTICE AND PROCEDURE, *supra* § 2725 at 115. *See Rinieri v. Scanlon*, 254 F.Supp. 469, 474 (S.D.N.Y.1966) (merely reciting the incantation "credibility" will not suffice).

Viewing the record in this proceeding against these principles, the Court determines that there are no material factual issues in dispute concerning the trustee's claims.[13] Only one defendant filed an affidavit opposing summary judgment.[14] That affidavit did not controvert any of the trustee's material factual averments, but, rather, sought to establish an "ordinary course of business" defense to preference avoidance under 11 U.S.C. § 547(c)(2). Defendants have offered nothing that might call into question the truth of the trustee's affidavit. At no time did the defendants, or any of them, indicate, directly or indirectly, that they questioned the sufficiency of the trustee's affidavit. I specifically find that defendants have failed to raise a legally sufficient challenge to the credibility of movant's affiant, Dr. Ron N. Bagley. Moreover, none of the defendants have availed themselves of the procedure provided by Rule 56(f), or instituted any discovery proceedings in this action.[15]

Defendants, apparently, have chosen to rest on their pleadings and the

---

13. In reaching this conclusion, the Court has considered all of the pleadings, evidence and arguments of counsel, regardless of whether they are specifically referred to in this memorandum opinion.

14. *See* Affidavit of Briant H. Summerhays (Feb. 24, 1984).

15. Rule 56(f), Fed.R.Civ.P., provides:

*(f) When Affidavits Are Unavailable.* Should it appear from the affidavits of a party opposing the motion for summary judgment that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

strength of their legal arguments. The importance that a litigant have his day in court cannot be gainsaid. A court's conclusion that the plaintiff is likely to prevail at trial is not a sufficient basis for refusing the defendant his day in court. *See Landy v. Silverman*, 189 F.2d 80, 82 (1st Cir. 1951). But if there is no genuine issue of material fact and one or the other party is entitled to prevail as a matter of law, the court will render judgment.

This Court cannot choose between conflicting evidence. That is the role of the fact-finder in a trial on the merits. But since defendants made no attempt to set forth any specific facts showing that there was a genuine issue for trial, and the factual evidence of the trustee's accountant possesses the characteristics of admissible evidence, the Court shall apply the law to the foregoing facts as established by the litigants' papers, and render judgment accordingly.

*Property of the Estate*

Defendants have raised an unusual defense to the trustee's claims.[16] Defendants' basic argument is that property obtained by fraud does not become property of the debtor's estate.[17] Defendants' argument with respect to property obtained by fraud is generally correct, but as with all such generalities is true only in certain contexts.

Section 541(a)(3) of the Bankruptcy Code provides that the debtor's estate includes any interest in property recovered by the trustee under Section 550. Section 550 permits the trustee to recover for the benefit of the estate property or the value thereof from the transferee of an avoided transfer. Section 541(a)(4) provides that the debtor's estate includes any interest in property preserved for the benefit of or ordered transferred to the estate pursuant to Section 551. The latter section provides that any transfer avoided under Sections 544, 547 or

548 is preserved for the benefit of the estate.

Section 541 represents a significant change in what constitutes property of the estate. Its scope is broad and includes all kinds of property, including tangible or intangible property, and causes of action. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 367 (1977), 1978 U.S.Code Cong. & Admin. News, 5787, p. 6323. Property of the estate is intended to include property made available to the estate by the exercise of the trustee's avoiding powers and in which the debtor did not have a possessory interest at the time the bankruptcy case commenced. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 2313 & n. 10, 76 L.Ed.2d 515 (1983). Property of the estate includes preferences and fraudulent conveyances recovered by the trustee. *See Matter of Drake*, 28 B.R. 582, 583 (Bkrtcy. E.D.Wis.1983). The purposes of the bankruptcy law must ultimately govern whether a particular item constitutes property. *Segal v. Rochelle*, 382 U.S. 375, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). The recovery of preferential transfers and fraudulent conveyances facilitates the fundamental bankruptcy policy of equality of distribution among creditors of the debtors. *See* H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 177–78 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6138.

It is urged by defendants that the trustee enjoys no greater property rights than the debtors had, and since the debtors had no right to recover the funds, neither does the trustee. *Cf.* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 367–68, 1978 U.S.Code Cong. & Admin.News, p. 6323; S.Rep. No. 95–989, 95th Cong. 2nd Sess. 82–83 (1978), 1978 U.S.Code Cong. & Admin.News, pp. 5868–69. Defendants' position is not well-founded.

The filing of a bankruptcy petition creates certain rights which the trustee

---

16. *Cf.* Krause "Classic Defenses to Trustee's Claims of Voidable Preferences," 73 Comm.L.J. 101 (1968).

17. Defendants also make additional minor arguments for which they cite no relevant statutory or case authority. The arguments are without merit.

may assert, regardless of whether such rights were possessed by the debtor prior to filing. In some respects, it is useful to think of a Chapter 11 debtor as a new entity, with its own rights and duties distinct from those of the pre-bankruptcy company. *See Shopmen's Local Union v. Kevin Steel Products, Inc.*, 519 F.2d 698, 704 (2d Cir.1975). *Cf. N.L.R.B. v. Bildisco and Bildisco*, —— U.S. ——, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) (rejecting "new entity" theory for purpose of rejecting collective bargaining agreement under 11 U.S.C. § 365).

 Generally, it is true that a trustee's rights under Section 541 are derivative from the rights of the debtor. *See In re Great Plains Western Ranch Company, Inc.*, 38 B.R. 899, 11 B.C.D. 894, 897 (Bkrtcy.C.D.Cal.1984). However, it is a mistake to assume that this is a definitive delimitation of the trustee's powers. As to fraudulent conveyances and preferences, the trustee has the rights of a judgment creditor as well as the powers specifically conferred by the bankruptcy law. *Dudley v. Easton*, 104 U.S. (14 Otto) 99, 103, 26 L.Ed. 668 (1881). When exercising his avoiding powers the trustee is not asserting a cause of action belonging to the debtor, but is acting in a representative capacity on behalf of all the creditors. *Fairbanks Shovel Co. v. Wills*, 240 U.S. 642, 648, 36 S.Ct. 466, 468, 60 L.Ed. 841 (1916); *In re Onondaga Litholite Co.*, 218 F.2d 671, 674, 50 A.L.R.2d 308 (2nd Cir.1955); *In re McDonald*, 173 F. 99, 102 (D.Mass.1908); *In re Best Pack Seafoods, Inc.*, 29 B.R. 23, 24, (Bkrtcy.D.Me.1983). In the exercise of such powers, the trustee enjoys greater rights than the pre-petition debtor. *See e.g., In re Leasing Consultants, Inc.*, 592 F.2d 103, 110 (2d Cir.1979) (the trustee stands not only in the shoes of the debtor— he fits as well into the "overshoes" of its creditors; when exercising his avoiding powers the trustee is not limited to the rights of the debtor); G. Glenn, "Creditor's Rights—A Review of Recent Developments," 32 Va.L.Rev. 235, 252 (1956). Funds obtained from investors in a "Ponzi" scheme are property, and are as susceptible of preferential and fraudulent disposition as other property.

*Constructive Trust*

Conceptually, defendants' argument is this: The transfers should not be considered as part of the debtors' estate because in substance they are restitution of money stolen from them by the debtors. Defendants reason that a constructive trust was created for their benefit, which precludes the trustee from avoiding the payments. In order to resolve this dispute, a harder look must be taken at defendants' proposition.

 In a classic statement, Justice Cardozo defined a constructive trust as "[t]he formula through which the conscience of equity finds expression." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919). The Restatement provides that "[w]here a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises." RESTATEMENT OF THE LAW OF RESTITUTION § 160 (1937). In his treatise, Professor Scott states that a constructive trust is not a trust at all but a restitutionary remedy. 5A Scott, THE LAW OF TRUSTS § 461 (3rd ed. 1967). Constructive trusts do not arise because of the expressed intent of the parties; they are created by courts of equity and do not come into existence until declared by a court as a means of affording relief. G. Bogert, HANDBOOK OF THE LAW OF TRUSTS § 77 at 208 (1973). *See In re Tinnell Traffic Services, Inc.*, 41 B.R. 1018, 1021 (Bkrtcy.M.D.Tenn.1984) (without a judicial decree imposing a constructive trust on the property in question, said property remains property of the estate); *In re Anderson*, 30 B.R. 995, 1014 (D.C.M.D.Tenn.1983); *In re Penn-Dixie Steel Corp.*, 6 B.R. 817, 824 (Bkrtcy.S.D.N.Y.1980), *aff'd*, 10 B.R. 878 (S.D.N.Y.1981); RESTATEMENT OF THE LAW OF RESTITUTION *supra* § 160,

Comment a ("A constructive trust does not, like an express trust, arise because of a manifestation of an intention to create it, but it is imposed as a remedy to prevent unjust enrichment.").

The emergence of the constructive trust as an equitable remedy has been described as follows:

> By all odds the most important contribution of equity to the remedies for prevention of enrichment is the device we all know as the constructive trust. For this device Lord Mansfield deserves neither credit nor blame. It emerged from the fog of eighteenth century equity and in its modern applications it is much more recent than the remedy of quasi contract.

J. Dawson, Unjust Enrichment: A Comparative Analysis, 26 (1951).

In 1877, the New York court first made the constructive trust available to reach the product of larceny. *See Newton v. Porter*, 69 N.Y. 133 (1877). This decision and others which followed dispensed with the requirement of an antecedent fiduciary obligation. Unjust Enrichment, *supra*, at 28. Professor Dawson states that "[t]his is the point that most clearly marks the transformation of the constructive trust into a generalized remedial device, with tracing as its most prominent feature." *Id.*

 A defrauded person may be able to reclaim his property from the debtor subsequent to filing bankruptcy by the declaration of a constructive trust, because the Bankruptcy Code does not authorize a trustee to distribute other people's property among the debtor's creditors. *See Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 135–36, 83 S.Ct. 232, 234–35, 9 L.Ed.2d 190 (1962). The law governing reclamation of property obtained by the debtor through fraud is well established. It was succinctly stated by the Fourth Circuit in *Manly v. Ohio Shoe Co.*, 25 F.2d 384, 385 (4th Cir.1928):

> Where goods are obtained by fraud of the bankrupt, the seller may rescind the contract of sale and reclaim them if he can identify them in the hands of the trustee. This is on the theory that fraud renders all contracts voidable, and that neither in law nor in morals would the trustee be justified in holding goods obtained by the fraud of the bankrupt for the benefit of other creditors. Such creditors have no right to profit by the fraud of the bankrupt to the wrong and injury of the party who has been deceived and defrauded ... This does not result in a preference in favor of the seller who thus retakes his own property which he must be able to identify.

*Cf.* 11 U.S.C. § 546(c).

 The imposition of a constructive trust requires proof of three elements: (1) a wrongful act; (2) specific property acquired by the wrongdoer which is traceable to the wrongful behavior; and (3) an equitable reason why the party holding the property should not be allowed to keep it. *Alsco-Harvard Fraud Litigation*, 523 F.Supp. 790, 806–07 (D.D.C.1981). *See American Serv. Co. v. Henderson*, 120 F.2d 525, 135 A.L.R. 1414 (4th Cir.1941). *Cf. Sacre v. Sacre*, 143 Me. 80, 55 A.2d 592, 600, 173 A.L.R. 1261 (1947).

Defendants contend that retention of their payments may be justified on the ground that the debtors' fraud created a constructive trust as to the funds. I shall assume, for purposes of deciding the motions before me, that the debtors' wrongdoing would satisfy the requirements for imposition of a constructive trust if the other elements are present.[b] *See* 4A COLLIER ON BANKRUPTCY ¶ 70.25[1], at 348 (14th ed. 1978). The question thus becomes one of tracing the trust property.

Tracing is based on the idea that the beneficiary is the owner in equity of the property sought to be recovered. Ownership connotes a property interest in an identified or identifiable thing. G. Bogert, THE LAW OF TRUSTS AND TRUSTEES § 921, at 363 (rev. 2d ed. 1982). The claimant may trace his property through an unlimited number of transactions or changes in form. 1 G. Palmer, THE LAW OF RES-

TITUTION § 2.14, at 178 (1978). Fifty years ago, the Ninth Circuit stated:

It is established beyond debate that no change of form can divest a trust fund of its trust character, and that the cestui may follow and reclaim his funds so long as he is able to trace and identify them, not as his original dollars or necessarily as any dollars, but through and into any form into which his dollars may have been converted.... The underlying principle of this rule is that the cestui que trust has been wrongfully deprived of that which belongs to him; that his right to his funds has not been lost or destroyed by the misappropriation; and that if, and to the extent, the cestui is able to follow and identify the amount of the misappropriated funds as having been used in the acquisition of other property he may recover.

*Republic Supply Co. of California v. Richfield Oil Co.*, 79 F.2d 375, 377 (9th Cir.1935) (citations omitted). *Cf. National Bank v. Insurance Co.*, 104 U.S. (14 Otto) 54, 69, 26 L.Ed. 693 (1881) ("[E]quity will follow the money, even if put into a bag or an undistinguishable mass, by taking out the same quantity.")

■ In the present case, every deposit received by the Clearing Houses was accepted at a time when they were hopelessly insolvent and not able to repay their investors except through deposits from subsequent investors. If the defendants retain their payments, it will be at the expense of the other victims. *See* THE LAW OF RESTITUTION, *supra* § 3.4, at 238. Because the effect of imposing a constructive trust is to give a preference or priority over other creditors, the burden is on the claimant to trace the trust funds. 4A COLLIER ON BANKRUPTCY, *supra*, ¶ 70.25[2] at 354–55. *See John Deere Plow Co. v. McDavid*, 137 F. 802, 811–12 (8th Cir.1905). In *Morris Plan Industrial Bank of New York v. Schorn*, 135 F.2d 538, 539 (2d Cir.1943), the court stated:

"[P]roperty converted, embezzled, or otherwise taken by the bankruptcy, or obtained by him by fraud, can be claimed from the bankruptcy estate only so long as it can be definitely traced, with the consequence that an attempted repayment by the bankrupt prior to bankruptcy is a preference, except where made from the very property taken.

*Accord, Little v. Chadwick*, 151 Mass. 109, 23 N.E. 1005 (1890). *See Kamberg v. Springfield National Bank*, 293 Mass. 24, 199 N.E. 339, 103 A.L.R. 306 (Mass.1935); *Walser v. International Union Bank*, 21 F.2d 294, 298 (2d Cir.1927).

■ In tracing their deposits, it is not sufficient to prove that the trust property went into the general assets of the insolvent estate. *Texas and Pacific Railway Co. v. Pottorff*, 291 U.S. 245, 261 n. 19, 54 S.Ct. 416, 420 n. 19, 78 L.Ed. 777 (1934); *Blumenfeld v. Union National Bank*, 38 F.2d 455, 457 (10th Cir.1930); G. Bogert, THE LAW OF TRUSTS AND TRUSTEES, *supra* § 921, at 367–69; 4A COLLIER ON BANKRUPTCY, *supra* ¶ 70.25[2], at 355–56. This concept was firmly clarified by the United States Supreme Court in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), which involved a fact situation virtually identical to the present case.

*Cunningham v. Brown, supra*, was a suit by the trustee of the estate of Charles Ponzi to recover as preferences certain payments to Ponzi's investors. The defendants were investors who, upon learning of the fraud, presented their notes for cancellation and received back their investments. The lower courts held that the payments were not preferences and that the defendants had rescinded their contracts for fraud and were entitled to a return of their money. The Supreme Court reversed the lower courts, holding that the payments constituted voidable preferences under the former Bankruptcy Act. The Court found that even if the payments constituted rescission for fraud, the defendants had failed to trace the money loaned to Ponzi into the payments received:

Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their

**1002**

inability to identify their payments, creditors and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankruptcy law. Those who were successful in the race of diligence violated not only its spirit but its letter and secured an unlawful preference.

*Cunningham v. Brown, supra,* 265 U.S. at 13, 44 S.Ct. at 427.

██ In the present case, tracing presents a serious problem for defendants. Their funds were not earmarked, but commingled when collected with sums deposited by other investors. *See Rosenberg v. Arata,* 3 B.C.D. 154, 155 (Bkrtcy.N.D.Tex. 1977). It is well settled that if funds are commingled with the general funds of the debtor and, hence, are unidentifiable, tracing cannot be accomplished and the claimant must assume the status of a general unsecured creditor. *Matter of Plazagal International Corp.,* 33 B.R. 47, 48–49 (Bkrtcy.S.D.N.Y.1983). *See* 4 COLLIER ON BANKRUPTCY ¶ 547.19, at 547–65 (15th ed. 1984). Defendants have not endeavored to trace their funds beyond deposit with the debtors.

In the typical case in which a constructive trust is sought, the trustee is in possession of property or a fund which the claimant seeks to have exempted from the bankruptcy estate. In the present case, however, the debtors' funds were virtually exhausted prior to filing their Chapter 11 petitions.[18] If trust funds are deposited in a bank account and mingled with other funds, and the mingled funds are entirely depleted, the trust funds become dissipated and no longer traceable. *Schuyler v. Littlefield,* 232 U.S. 707, 710, 34 S.Ct. 466, 466–467, 58 L.Ed. 806 (1914); *Johnson v. Morris,* 175 F.2d 65, 67 (10th Cir.1949). *See* 4 COLLIER ON BANKRUPTCY ¶ 541.13, at 541–69 (15th ed. 1983). *Cf. Texas and Pacific Railway Co. v. Pottorff, supra* 291 U.S. at 261–62, 54 S.Ct. at 420 (in the absence of a trust *res* a constructive

trust will not be imposed to confer a preference to one creditor).

Defendants cited four cases in support of their position, *In re Teltronics, Ltd.,* 649 F.2d 1236 (7th Cir.1981), *In re Paragon Securities Co.,* 589 F.2d 1240 (3d Cir.1978), *Nicklaus v. Bank of Russellville,* 336 F.2d 144 (8th Cir.1964), *Corporation of the President of the Church of Jesus Christ of Latter-Day Saints v. Jolley,* 24 Utah 2d 187, 467 P.2d 984, 38 A.L.R.3d 1350 (1970), each of which can be distinguished from the present case on factual and legal grounds.

In *In re Teltronics, supra,* 649 F.2d at 1236, the debtor defrauded thousands of consumers who responded to magazine advertisements offering digital watches for sale. The watches were never delivered and the principal of the debtor absconded with $1,300,000.00. The Attorney General filed an action under the Illinois Consumer Fraud and Deceptive Business Practices Act, pursuant to which a receiver was appointed and took possession of $836,000.00 held in Teltronic's checking account. Subsequently, certain business creditors filed an involuntary bankruptcy petition against Teltronics. In an action seeking turnover of the funds, the bankruptcy court entered a judgment for the bankruptcy receiver. The district court reversed and an appeal was taken to the Seventh Circuit. The Court of Appeals held that the provisions of the Illinois Consumer Fraud Act, which provided a mechanism for the defrauded customers to share equally in the fund, warranted an exception to the tracing requirement of *Cunningham v. Brown, supra.*

*Matter of Paragon Securities Co., supra,* 589 F.2d at 1240, concerned a reclamation petition filed by a creditor to recover money paid to the debtor for the purchase of New Jersey Turnpike bonds. It was argued that the debtor acted fraudulently in inducing the creditor to enter into a contract for the purchase of the municipal securities. The Third Circuit upheld the

---

**18.** *See In re Independent Clearing House and Universal Clearing House,* Nos. 81–02886, 81– 02887 (transcript of hearing, Sept. 25, 1981 at 8–9).

determination by the bankruptcy court and the district court that the creditor failed to establish the necessary elements of fraud by clear and convincing evidence. In so holding, the Court of Appeals did not have occasion to consider the question of tracing.

In *Nicklaus v. Bank of Russellville, supra,* 336 F.2d at 144, Bronson Woodworth, an individual, used a corporate entity, Bronson Woodworth, Inc., as a medium to perpetrate a fraud on the Bank of Russellville, for which he was convicted in a criminal proceeding. A civil action was commenced in the Chancery Court of Pope County, Arkansas, to establish ownership of certain bonds in the possession of the bank and money paid into the registry of the court. After adjudication as a bankrupt, the trustee of Bronson Woodworth, Inc., sought to recover the bonds and currency. Stating that "a Trustee in Bankruptcy can have no interest in property acquired by the fraud of a bankrupt, or anyone else, as against the claim of the rightful owner of such property," the Eighth Circuit affirmed the judgment of the district court. *Id.* at 146.

In *Corporation of the President of the Church of Jesus Christ of Latter-Day Saints v. Jolley, supra,* 467 P.2d at 984, the Utah Supreme Court affirmed the judgment of the trial court impressing a constructive trust upon two new automobiles purchased with funds embezzled from plaintiff. In 1967 and 1968, an accountant employed by the plaintiff church devised a scheme for embezzling funds through the use of fictitious firm names and pretended payment of claims. Using embezzled funds deposited in a fictitious account, the accountant purchased a Pontiac Firebird. Subsequently, using funds from the same account, he purchased a Chevrolet Corvette. He made two additional cash payments on the Corvette, totaling $2,008.87, which could not be traced directly to the fictitious account of embezzled funds. However, the evidence adduced at trial did show that a few days before he made these cash payments on the automobile, he withdrew $2,700.00 from the account. Upon completion of the purchases, titles to both of the automobiles were transferred to the defendant, Vickie Jolley, for no consideration.

In affirming the trial court, the Utah Supreme Court held that the facts of the case provided a reasonable basis for the trier of fact to infer that the Corvette was paid for entirely by money embezzled from the plaintiff:

> As to the defendant's second contention: that the plaintiff is not entitled to recover an equitable portion of the Corvette represented by the $1,958.87 and $50 cash payments which were not traced directly to the embezzled funds, this is to be said: Such direct tracing of funds is not an indispensable requisite to the conclusion arrived at. In the nature of the function of determining facts it is essential that the court or jury have the prerogative of finding not only facts based upon direct evidence, but also those which may be established from the reasonable inferences that may be deduced therefrom.

467 P.2d at 985. *Jolley,* therefore, stands only for the undoubted proposition that the trier of fact may draw reasonable inferences from the facts when tracing embezzled funds into their product.

The critical defect in the defendants' position lies not with the principles expressed in the foregoing cases, but with the facts. An important factual difference between those cases and the present one is the existence of a trust *res.* In each of the cases cited by defendants, the parties were concerned with identifiable property. In *Teltronics,* an opinion which should be read in light of its particular facts and circumstances, the court determined that an exception to the tracing requirement was warranted where Illinois law provided an equitable distribution scheme for funds in the possession of the state court receiver. The debtor's estate in *Paragon Securities* had sufficient funds to pay the $50,680.83 sought to be recovered by the claimant. In *Nicklaus,* the bonds and currency at issue

were in the possession of the bank or on deposit in the registry of the court. In *Jolley,* the Utah court did not rewrite the tracing rules but merely permitted the trier of fact to make the inference that certain funds withdrawn from an account containing embezzled money were used to acquire the trust property.[19] *Cf.* RESTATEMENT OF THE LAW OF RESTITUTION § 160, Comment *i* (1937) ("A constructive trust does not arise unless there is property on which the constructive trust can be fastened, and such property is held by the person to be charged as constructive trustee.").

■ Clearly, a thief, having stolen money, may be treated as a trustee of the proceeds and also of any property into which they have been transformed, so long as either may be identified. Where, however, the specific proceeds, in their original or transformed shape may not be traced, there is nothing to which a constructive trust may attach. The controlling factor in every case is whether the property of the claimant can be traced into some fund or other property that is before the court. The constructive trust conceived by defendants, *i.e.,* one that retroactively validates prepetition transfers of unidentifiable funds, would operate not against the fraudulent debtors, but against other equally innocent investors. *Cf. Fagan v. Whidden,* 57 F.2d 631, 632 (5th Cir.1932).

■ A constructive trust is an equitable restitutionary remedy. It is imposed by a court of equity when retention of the property by a defendant would result in his unjust enrichment. The term "constructive trust" simply connotes a method of preventing unjust enrichment, whereby a court of equity construes a particular situation as if the property were held by the defendant in trust for the plaintiff, with the sole trust obligation being to convey the property to the plaintiff. Even if fraud on the part of the debtors would have given defendants the right to rescind their contracts, trace their deposits, and impress a constructive trust upon them, that is not what occurred. The defendants did not rescind their contracts but accepted monthly payments in accordance with the express terms thereof. When we stop to consider the injustice that would result if a constructive trust were erected in the manner urged by defendants, we instantly see that a court of equity would never sanction such an act. If this Court were to hold that a debtor's fraud nullified the trustee's avoiding powers, a basic purpose of the bankruptcy law would be thwarted. Preferential and fraudulent transfers would be allowed to stand and certain favored creditors would reap the benefit of the debtor's wrongdoing. It would lend judicial support to "Ponzi" schemes by rewarding early investors at the expense of later victims. Here, as in *Cunningham v. Brown, supra,* 265 U.S. at 13, 44 S.Ct. at 427, "the circumstances ... call strongly for the principle that equality is equity." Thus, both the policy of the Bankruptcy Code and well settled principles of restitution dictate that a constructive trust not be impressed upon the funds received by defendants. *Cf. United States v. Randall,* 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971) (the bankruptcy law is an overriding expression of federal policy which may preclude the imposition of a constructive trust against assets of the estate, even where the elements of a constructive trust are present).

Having concluded that defendants' argument regarding property obtained by fraud lacks merit, the Court now turns to the various causes of action alleged in the trus-

---

**19.** This Court previously construed the *Jolley* case as it relates to commingling. *See In re Ongley,* No. 80–00169 (transcript of ruling, Apr. 28, 1981). In *Ongley,* the defendant had commingled funds wrongfully obtained with his own legitimate funds. The issue went to the burden of proof in tracing the commingled funds into specific property. This Court held that the plaintiff must come forward in the first instance with some evidence, direct or indirect, that embezzled money went into the purchase of certain property. The burden then shifts to the defendant to show that a certain amount of the purchase price came from legitimate sources. After weighing the evidence and applying the burden of proof as set forth, the Court will determine the extent of the constructive trust with respect to each item of property in issue.

tee's amended complaint. For its own convenience in analyzing these claims, the Court shall consider them in an inverted order.

*Trustee's Third Cause of Action*

The trustee's third cause of action seeks to set aside and recover *all* payments made to investors within the year preceding filing of the bankruptcy petitions, notwithstanding the fact that these defendants are net losers, having received from 3 percent to 76 percent of their original investments. The trustee argues that restitution of all sums paid to investors would enable him to redistribute such funds ratably among all investors, including the 924 who received nothing, thereby promoting the fundamental bankruptcy policy of equality of distribution. Not surprisingly, direct authority on this issue is lacking.

■ In his memorandum, the trustee has endeavored to convey a convincing version of a rather vague theory. Irrespective of the authorities cited by the trustee, it would be difficult, if not impossible, to sanction the result for which he argues. There are three bases for the trustee's theory. First, he argues that as a court of equity the bankruptcy court has broad power to compel turnover of all payments made to investors. It is undoubtedly true that the bankruptcy court is a court of equity and proceedings in bankruptcy are governed by equitable principles. *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966); *Pepper v. Litton,* 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *American Employers' Insurance Co. v. King Resources Co.,* 556 F.2d 471, 478 (10th Cir. 1977); *Matter of Topeka Motor Freight, Inc.,* 553 F.2d 1227, 1231 (10th Cir.1977); *Mason v. Ashback,* 383 F.2d 779, 780 (10th Cir.1967); *May v. Fidelity & Deposit Company of Maryland,* 292 F.2d 259, 261 (10th Cir.1961). *See* 28 U.S.C. § 1481. A trustee's powers, however, are statutory and limited. The Bankruptcy Code places restrictions upon the trustee's powers to nullify transactions between a debtor and its creditors.

In *Eby v. Ashley,* 1 F.2d 971 (4th Cir. 1924), *cert. denied,* 266 U.S. 631, 45 S.Ct. 197, 69 L.Ed. 478 (1925), cited by the trustee, the court was called upon to decide whether fictitious "profits" paid to an investor in a fraudulent investment scheme could be recovered by the bankruptcy trustee. In dicta, the Fourth Circuit stated:

> It may be that exact equitable equality among the victims of Young could be attained only in an equitable proceeding, under which all of Young's customers would be charged with all payments made to them, and such contribution among them required as would be necessary to give each victim the same per cent of the money paid in; but that point is not before us.

*Id.* at 973. This point was purely dicta and formed no part of the judicial reasoning in the case. The holding, in contrast, was that payments of fictitious profits to the defendant, for which no consideration was given, constituted a fraudulent conveyance.

■ The equitable powers of the bankruptcy court are limited by the express terms of the Code. *See Banque de Financement v. First National Bank of Boston,* 568 F.2d 911, 915 (2d Cir.1977). A court of equity may not create totally new substantive rights under the guise of doing equity. *Marvin v. Marvin,* 122 Cal.App.3d 871, 176 Cal.Rptr. 555, 559 (1981). *Cf. In re 1430 Equities, Inc.,* 4 B.C.D. 806, 810, 18 C.B.C. 289, 297 (Bkrtcy.S.D.N.Y.1978) (the court must apply the bankruptcy law, not rewrite it). I therefore conclude, in the absence of any statutory or judicial precedent, that the court may not invoke its equitable powers to substantively enlarge the trustee's avoiding powers as urged in this case.[20]

20. Even if it were within this court's equitable power to grant the relief prayed for by the trustee, the circumstances of this case militate strongly against its exercise. As a court of equity, the bankruptcy court must consider the balance of hurt. To undo all of these transactions would cause incalculable harm to hundreds of people, at a staggering cost, for which no com-

The second argument upon which the trustee bases his theory is that all payments constitute fraudulent conveyances that may be avoided under 11 U.S.C. § 548.[21] This section is inapplicable for several reasons.

Section 548 of the Code is derived from Section 67(d) of the 1898 Act and "permits the trustee to avoid transfers by the debtor in fraud of his creditors." S.Rep. No. 95–989, 95th Cong., 2d Sess. 89 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5875.

In order to avoid a transfer pursuant to Section 548(a)(1), the trustee has the burden of proving that the transfer was made with actual intent to hinder, delay, or defraud creditors. The trustee contends that in a "Ponzi" scheme the circumstances are such as to preclude any reasonable conclusion other than that the purpose of the transfers was fraudulent as to creditors. *Cf.* 4 COLLIER ON BANKRUPTCY ¶ 584.-02[5], at 548–33 to 548–37 (15th ed. 1984).

In *Coder v. Arts,* 213 U.S. 223, 242, 29 S.Ct. 436, 443, 53 L.Ed. 772 (1909), the Supreme Court discussed the meaning of "actual intent to hinder, delay or defraud creditors" as it was used in Section 67(e) of the Bankruptcy Act, the predecessor of Section 548(a)(1):

> What is meant when it is required that such conveyances in order to be set aside shall be made with the intent on the bankrupt's part to hinder, delay or defraud creditors? This form of expression is familiar to the law of fraudulent conveyance, and was used as the common law, and in the statute of Elizabeth, and has always been held to require, in order to invalidate a conveyance, that there shall be actual fraud; and it makes no difference that the conveyance was made upon a valuable consideration, if made for the purpose of hindering, delaying or defrauding creditors. The question of fraud depends upon the motive. Kerr on Fraud and Mistake, 196, 201. The mere fact that one creditor was preferred over another, or that the conveyance might have the effect to secure one creditor and deprive others of the means of obtaining payment, was not sufficient to avoid a conveyance; but it was uniformly recognized that, acting in good faith, a debtor might thus prefer one or more creditors. *Stewart, et al. v. Dunham, et al.,* 115 U.S. 61 [5 S.Ct. 1163, 29 L.Ed. 329 (1885) ]; *Huntley v. Kingman,* 152 U.S. 527 [14 S.Ct. 688, 38 L.Ed. 540 (1894) ].

> We are of the opinion that Congress, in enacting § 67(e), and using the terms "to hinder, delay or defraud creditors," intended to adopt them in their well-known meaning as being aimed at conveyances intended to defraud. In § 60 merely preferential transfers are defined, and the terms on which they may be set aside are provided; in § 67(e), transfers fraudulent under the well-recognized princi-

mensurate benefit would lie. "Such a result would be most shocking to a sense of justice and fairness, and should only be effected if the facts clearly and fully established and found are such that the law applicable thereto requires such conclusion. The facts as found herein are not of such character." *Saperston v. National Bond & Investment Co.,* 217 N.Y.S. 611, 612, 128 Misc. 25 (Sup.Ct.1926).

**21.** Section 548 of the Bankruptcy Code provides in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer occurred or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

ples of the common law and the statute of Elizabeth are invalidated. The same terms are used in § 3, subdivision 1, in which it is made an act of bankruptcy to transfer property with intent to hinder, delay or defraud creditors. Such transfers have been held to be only those which are actually fraudulent.

■■■■■ This Court is not persuaded that the facts as stated in the affidavit of the trustee's accountant would support a finding of fraudulent intent under Section 548(a)(1). I am hesitant to hold that actual intent to hinder, delay, or defraud can never be established in a motion for summary judgment, and refrain from doing so. *Cf. Conroy v. Shott,* 363 F.2d 90, 91 (6th Cir. 1966) (in a "Ponzi" scheme "the question of intent to defraud is not debatable"); *Guy v. Abdulla,* 57 F.R.D. 14, 17 & n. 2 (N.D. Ohio 1972). As a general proposition, however, summary judgment is inappropriate when issues of motive, intent, and other subjective feelings are material. 6 Pt. 2 J. Moore, MOORE'S FEDERAL PRACTICE 56.17[41.–1], at 56–930 (1982); *Jackson v. Star Sprinkler Corp. of Florida,* 575 F.2d 1223, 1231 (8th Cir.1978) (holding, however, that the record in the case established as a matter of law that a transfer was made with actual intent to hinder, delay, and defraud creditors). The Court holds that the trustee has not carried his burden of proof to show that the monthly payments to defendants were made with such actual intent. Moreover, even if the Court were to assume that actual intent to defraud was present, defendants would be immune from the trustee's avoidance power under Section 548(c). I am convinced that as a matter of law these defendants took their payments for value and in good faith.

■■■■ There is even less merit in the trustee's further argument that the debtors received less than a reasonably equivalent value from the defendants. "Value" is

defined in Section 548(d)(2) to include satisfaction of an antecedent debt of the debtor. In this case, the transfers at issue were payments on contractual debts much larger than the sums transferred, which did not satisfy the entire indebtedness. According to the trustee's accountant, defendants received from 3 percent to 76 percent of their original investments. The trustee argues that the debtors received less than a reasonably equivalent value in exchange for the monthly payments made to investors because defendants bargained for and gave consideration for one thing, namely, a fixed monthly rate of return to be derived from the profits of an accounts payable factoring program, but received something completely different—funds deposited by later investors.[22] This argument lacks merit. Regardless of how the debtors' transactions with the defendants are characterized, the debtors received a "reasonably equivalent value" from these defendants since the monthly payments when aggregated did not exceed the amounts deposited with the debtors. Therefore, the transfers cannot be avoided under Section 548(a)(2).

■■■■ The trustee's claim against all payments made by the debtors to their investors fares no better under his trust fund theory. According to the trustee, the funds deposited by the investors represented a capital investment in the debtor's accounts payable business. Under the "corporate trust fund" doctrine, the capital stock of a corporation represents a trust fund for the payment of its debts. *In re MortgageAmerica Corp.,* 714 F.2d 1266, 1269 (5th Cir.1983). In legal effect, the trustee argues, monthly payments to investors were unlawful "dividends" paid while the debtors were insolvent. Therefore, he contends, such funds are recoverable. *See* G. Glenn, FRAUDULENT CONVEYANCES AND PREFERENCES, *supra* § 604;

---

**22.** When a person persuades another to enter into an agreement, and to build expectations and calculations upon the supposition that its terms will be fulfilled, a moral obligation arises. Defendants' answers to the trustee's interrogatories show that each investor had "his own 'world', his own set of objectives, and his own expectations about the transaction, formed in the light of those objectives." *See* Farnsworth, "Disputes Over Omissions in Contracts," 68 Columbia L.Rev. 860, 868 (1968).

Note, "Recovery of Illegal Dividends from Stockholders, 2 Brooklyn L.Rev. 82 (1932). I find that application of the trust fund theory is unwarranted under the facts of this case. In response to the trustee's argument, it is sufficient to point out that the concepts of capital stock and capitalistic business enterprise are not relevant in the context of a "Ponzi" scheme. *Cf. Conroy v. Shott, supra,* 363 F.2d at 92 (loans extended to debtor by its defrauded victims are not "income"). Furthermore, the debtors' sphere of business activity was confined to soliciting investments and making payments with new investors' funds. The "creditors" for whom the trust fund is supposed to exist are the investors themselves. There are no others.

Upon consideration and review of the affidavit of the trustee's accountant, the pleadings and answers to interrogatories filed in this adversary proceeding, and the cited legal authorities, the Court concludes that the payments to investors outside of the preference period, other than sums received in excess of their investments, are not avoidable under any provision of the Bankruptcy Code. The Court will grant summary judgment in favor of defendants and will dismiss the third cause of action of plaintiff's amended complaint with prejudice.

*Trustee's Second Cause of Action*

The trustee's second cause of action seeks to recover from approximately eighty investors fictitious "profits" or amounts paid in excess of the principal amounts invested by each defendant, upon the theory that such payments constitute fraudulent conveyances voidable under Section 548(a)(2) of the Code. The reported decisions, though only six in number, support the trustee's theory.

It is not disputed that the transfers occurred within one year of filing bankruptcy at a time when the debtors were insolvent. This leaves for discussion only the question of whether the debtors received less than a reasonably equivalent value in exchange for the transfers. The question of reasonably equivalent value is generally a ques-

tion of fact, *see e.g., Klein v. Tabatchnick,* 610 F.2d 1043, 1047–48 (2d Cir.1979), but in some circumstances it is appropriate to treat the issue as one of law. *See Durrett v. Washington National Insurance,* 621 F.2d 201, 203 (5th Cir.1980). This Court is of the opinion, based on the discussion which follows, that the question of reasonably equivalent value may be properly treated as a legal issue in this case, the essential facts in the matter having been established.

In support of his theory, the trustee relies primarily on three cases, *Rosenberg v. Collins,* 624 F.2d 659 (5th Cir.1980), *Abrams v. Eby,* 294 F. 1 (4th Cir.1923), and *Larrimer v. Feeney,* 411 Pa. 604, 192 A.2d 351 (Pa.1963). Three additional cases deal with the issue of liability under these circumstances: *Eby v. Ashley, supra,* 1 F.2d at 971; *In re Moore,* 39 B.R. 571 (Bkrtcy. M.D.Fla.1984); and *Rosenberg v. Arata,* 3 B.C.D. 154 (Bkrtcy.N.D.Tex.1977).

In *Eby v. Ashley,* the trustee sued to recover fictitious profits paid to an investor in a fraudulent blind pool. The lower court found that payments in excess of the amount of the defendant's investment were without consideration. The Fourth Circuit affirmed, holding that the excess payments were gratuitous and therefore a fraud on the debtor's creditors. *Abrams v. Eby,* was an action in the same case disallowing the claim of an investor who had received a net profit from the fraud. Abrams deposited $4,000.00 with the debtor, for which he received $2,796.00 in fictitious profits and the return of $2,000.00 in principal. After bankruptcy, Abrams filed a claim for $2,000.00. The Fourth Circuit held that Abrams had to restore all sums paid to him as profits before he could share in the bankruptcy dividend. *See also In re Tedlock Cattle Company, Inc.,* 552 F.2d 1351 (9th Cir.1977) (approving "equity" theory as measure of recovery for defrauded "Ponzi" scheme investors out of funds available for bankruptcy distribution).

In *Larrimer v. Feeney, supra,* 192 A.2d at 351, the trustee sued to recover as a fraudulent conveyance the excess of pay-

ments over the amount of defendant's loan to the debtor plus interest at the legal rate. The Pennsylvania Supreme Court, applying Section 4 of the Uniform Fraudulent Conveyances Act, held that the excess payments made while the debtor was insolvent were without fair consideration and could be avoided by the bankruptcy trustee.

*Rosenberg v. Collins, supra,* 624 F.2d at 659, and *Rosenberg v. Arata, supra,* 3 B.C.D. at 154, were actions by the trustee to recover excess payments made to investors in a fraudulent commodities investment business. Over 900 investors deposited sums totaling 2.4 million dollars with the debtor, who was to buy and sell commodity futures on their behalf. The debtor actually never engaged in commodity trading on behalf of his clients, but deposited the funds in his general checking account and used them for personal and unrelated business purposes. The debtor furnished investors with quarterly financial statements showing purported commodity trades on their behalf and the profits and losses of those trades. The statements were wholly fictitious. Within the year preceding bankruptcy, cash withdrawals were transferred to customers from funds in the debtor's bank account. Some customers received no payments, others received payments less than their deposits, and some received payments in excess of their deposits. After the debtor filed a bankruptcy petition, the trustee brought suit under Section 67(d) of the former Bankruptcy Act to recover the amounts received by investors in excess of their deposits. In each action, the court held for the trustee and rejected the defendants' argument that a constructive trust impressed upon the funds prevented their recovery by the trustee.

In a recent decision involving a "Ponzi" scheme, the bankruptcy court for the Middle District of Florida held that an investor who received $62,000.00 from a $40,000.00 investment with the fraudulent debtor was liable to the estate for $22,000.00 under Section 548(a)(2) of the Code. In *In re Moore, supra,* the debtor represented that the insurance company with which he was associated as a general agent permitted its agents to invest funds for a ten percent monthly return. Of course, no such opportunity existed, but this "Ponzi" scheme variation induced investors in his community to deposit approximately one-half million dollars with him. In holding for the trustee, the court considered and rejected the argument that the "profit" held by the defendant was not part of the debtor's estate.

 It is thus apparent that the few courts which have considered the question are unanimous in requiring the transferee to disgorge his "Ponzi" scheme profits. These opinions are well grounded in reason, clear and persuasive. They lead to just and equitable results and are fully applicable to the facts of this case. Based on the undisputed facts of this case and for the reasons set forth in *Rosenberg v. Collins, Eby v. Ashley, In re Moore,* and *Rosenberg v. Arata,* I conclude, as a matter of law, that the debtors received less than a reasonably equivalent value in exchange for these transfers. Each of these transfers is, therefore, fraudulent under Section 548(a)(2) and may be set aside by the trustee.

*Trustee's First Cause of Action*

 The trustee's first cause of action seeks to recover from approximately 918 individuals and entities payments made within 90 days before the debtors filed their bankruptcy petitions.[23] The payments are alleged by the trustee to constitute preferences voidable under 11 U.S.C. § 547(b) and not falling within any of the exceptions found in 11 U.S.C. § 547(c). To recover as preferences the payments made to investors, the burden is on the trustee to prove every element of a preference. *Moran Bros., Inc. v. Yinger,* 323 F.2d 699, 701 (10th Cir.1963); *In re Belize Airways, Ltd.,*

**23.** Exhibit "C" to the affidavit of the trustee's accountant contains an 84 page list of the defendants against whom judgment is sought and the amount received by each during the 90 days preceding the bankruptcy filings.

18 B.R. 485, 487, 8 B.C.D. 1177 (Bkrtcy.S. D.Fla.1982); *In re Gruber Bottling Works, Inc.*, 16 B.R. 348, 351 n. 5 (Bkrtcy.E.D.Pa. 1982). If any element is missing, the trustee is not entitled to recover. *Matter of Yale Express System, Inc.*, 11 B.R. 495, 499 (Bkrtcy.S.D.N.Y.1981).

The elements of a voidable preference under Section 547(b) consist of the following: (1) a transfer of the debtor's property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor before such transfer was made; (4) made while the debtor was insolvent; (5) made on or within 90 days before the date of the filing of the bankruptcy petition; and (6) which enables the favored creditor to receive more than he would have received (a) if the case were a liquidation case, (b) the transfer had not occurred, and (c) such creditor received payment of such debt to the extent provided under the Bankruptcy Code. 11 U.S.C. § 547(b); 4 COLLIER ON BANKRUPTCY ¶ 547.01, at 547–10 (15th ed. 1983); 2 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE § 32.03 (1981); Levin, "An Introduction to the Trustee's Avoiding Powers," 53 Am.Bankr.L.J. 176, 183 (1979).

The purpose of the law of preferences is to secure an equal distribution of an insolvent debtor's assets. H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 177–78 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6138; *In re Thomas Farm Systems, Inc.*, 18 B.R. 543, 544 (Bkrtcy.E.D.Pa.1982); *Matter of Yale Express System, Inc., supra*, 11 B.R. at 499. *See* 2 G. Glenn, FRAUDULENT CONVEYANCES AND PREFERENCES § 376 (rev. ed. 1940). In *Pirie v. Chicago Title and Trust Company*, 182 U.S. 438,

449, 21 S.Ct. 906, 910, 45 L.Ed. 1171 (1901), the Court stated, "It is hardly necessary to assert that the object of a bankrupt act, so far as creditors are concerned, is to secure equality of distribution among them of property of the bankrupt—not among some of the creditors, but among all of them. Such object could not be secured if there were no provisions against preferences—no provisions for defeating their purpose. And it is no reflection on the statute that it does not do so entirely." [24] Under the Bankruptcy Code, preference law has been transformed into a strict liability concept. 2 W. Norton, NORTON BANKRUPTCY LAW AND PRACTICE § 32.11 (1981).

The Court shall examine each element of a preference to determine if the trustee has met his burden of proof in this summary judgment proceeding.

▮▮▮ (1) *A Transfer of Property of the Debtor.* It is undisputed that the payments to defendants were made by check and occurred on or after July 10, 1981. The definition of a transfer under the Bankruptcy Code is extensive and includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property." 11 U.S.C. § 101(40). The legislative history indicates that Congress intended the definition to be "as broad as possible." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 314 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6271; S.Rep. No. 95–989, 95th Cong., 2d Sess. 27 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5813. *See* 2 W. Norton, *supra* § 32.04 (the apparent intent of this definition is to broadly encompass

---

24. *Cf. Palmer v. Radio Corporation of America*, 453 F.2d 1133, 1140–42 (5th Cir.1971) ("Proceedings in bankruptcy often generate harsh results; indeed the very nature and theory of bankruptcy contemplates injury to some claimants.") *Matters v. Manufacturer's Trust Co.*, 54 F.2d 1010, 1016 (2d Cir.1932) (Learned Hand, J.) (In a preference action, the transferee suffers no loss, but is put back where he was when the debtor's insolvency occurred); *Swarts v. Fourth National Bank*, 117 F. 1, 3 (8th Cir.1902) (The rights, wrongs, benefits and injuries to creditors are always secondary to the policy of equal distribution of the debtor's property among its unsecured creditors.); *In re Teasley*, 29 B.R. 314, 315 (Bkrtcy.W.D.Ky.1983) (Preference law permits the trustee to yield awesome powers and even, "in effect, change the rules after the game is over."); *In re Anders*, 20 B.R. 468, 469 (Bkrtcy.M.D.Fla.1982) (It has never been contended that the recovery of preferences by the trustee is fair to the preferred creditor; it is those creditors who did not receive payment within the preference period that are aided by a preference recovery action).

all forms of conveying property interests); 4 COLLIER ON BANKRUPTCY, *supra* ¶ 547.08, at 547–28 to 547–30. Property of the debtor includes preferences and fraudulent conveyances recovered by the trustee. *Matter of Elin*, 20 B.R. 1012, 1016–17 (D.N.J.1982); *Matter of Perry, Adams & Lewis Securities*, 30 B.R. 845, 854 (Bkrtcy. W.D.Mo.1983); *Matter of Drake*, 28 B.R. 582, 583 (Bkrtcy.E.D.Wis.1983). Payment of a debt by check is a transfer of property of the debtor within the meaning of Section 547(b). *Matter of Duffy*, 3 B.R. 263, 265, 6 B.C.D. 88, 1 C.B.C.2d 641 (Bkrtcy.S.D.N.Y. 1980). Generally, a transfer of property of the debtor, within the meaning of Section 547(b), occurs whenever there is a giving or conveying of anything of value which has debt-paying or debt-securing power. *See* 4 COLLIER ON BANKRUPTCY, *supra* ¶ 547.08 at 547–32. I therefore find that the payments to defendants constitute transfers of property of the debtors.

(2) *To or for the Benefit of a Creditor.* Section 101(9) of the Code defines a creditor as an entity that has a claim against the debtor's estate. Creditors include only holders of prepetition claims against the debtor. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 309 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6266; S.Rep. No. 95–989, 95th Cong., 2d Sess. 22 (1978), 1978 U.S. Code Cong. & Admin.News, p. 5808; *In re Amatex Corp.*, 30 B.R. 309, 315, 10 B.C.D. 955 (Bkrtcy.E.D.Pa.1983). A claim is defined as a right to payment, whether or not the right is contingent. 11 U.S.C. § 101(4). The defendants have claims arising from the debtors' default in payments to them under the terms of their "undertaker" contracts. I therefore find that the transfers to defendants satisfy the requirement of 11 U.S.C. § 547(b)(1).

(3) *For or on Account of an Antecedent Debt.* A debt is defined as a liability on a claim. 11 U.S.C. § 101(11). The terms "claim" and "debt" are coextensive. A creditor has a "claim" against the debtor; the debtor owes a "debt" to the creditor. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 310 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6267; S.Rep. No. 95–989, 95th

Cong., 2d Sess. 23 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5809. A prior debt that is reduced or discharged as a result of payment within 90 days of bankruptcy is an antecedent debt within the meaning of Section 547(b)(2). Pursuant to paragraphs 2 and 7 of the "undertaker" contracts, upon execution of the agreement the debtor incurred an obligation to repay the principal amount deposited, together with a fixed rate of return. I therefore find that the transfers to defendants satisfy the requirement of 11 U.S.C. § 547(b)(2).

(4) *Made While the Debtor was Insolvent.* Section 547(f) of the Code provides the trustee with a statutory presumption that the debtor was insolvent on and during the 90 days immediately preceding the date of the filing of the bankruptcy petition. The presumption of insolvency is governed by the standards of Rule 301 of the Federal Rules of Evidence, which places the ultimate burden of proof on the issue of insolvency on the trustee, but does not require him to present evidence on this issue unless the defendant creditor first comes forward with some evidence to rebut the presumption. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 375 (1977), 1978 U.S. Code Cong. & Admin.News, p. 6331; S.Rep. No. 95–989, 95th Cong.2d Sess. 89 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5875; *In re Thomas Farm Systems, Inc., supra,* 18 B.R. at 544; *In re Butler,* 3 B.R. 182, 185–86, 6 B.C.D. 32, 1 C.B.C.2d 533 (Bkrtcy.E.D.Tenn.1980). None of the defendants have attempted to controvert the trustee's evidence that the debtors were inherently insolvent from the beginning of the "Ponzi" scheme. *See* Affidavit of Ron N. Bagley in Support of Trustee's Amended Motion for Summary Judgment, at ¶¶ 16–19 (Feb. 24, 1984). *Cf. Conroy v. Shott,* 363 F.2d 90, 92 (6th Cir.1966). I therefore find that the transfers to defendants satisfy the requirements of 11 U.S.C. § 547(b)(3).

(5) *Made Within 90 Days of Bankruptcy.* In the case of an ordinary check, the overwhelming majority of courts have held that a transfer for purposes of determining

**1012**

whether there has been a preference occurs when the check is presented for payment and honored. *See, e.g., Klein v. Tabatchnick,* 610 F.2d 1043, 1049 (2d Cir.1979); *In re Naudain, Inc.,* 32 B.R. 871, 874 (Bkrtcy. E.D.Pa.1983); *Matter of Ellison,* 31 B.R. 545, 547 (Bkrtcy.M.D.Ga.1983); *In re Moran Air Cargo, Inc.,* 30 B.R. 406, 408 (Bkrtcy.D.R.I.1983); *In re Mailbag International, Inc.,* 28 B.R. 905, 907, 10 B.C.D. 496 (Bkrtcy.D.Conn.1983); *In re Skinner Lumber Co.,* 27 B.R. 669, 670 (Bkrtcy.D.S. C.1982); *Matter of Advance Glove Mfg. Co.,* 25 B.R. 521, 525, 9 B.C.D. 1395 (Bkrtcy.E.D.Mich.1982); *In re Fabric Buys of Jericho, Inc.,* 22 B.R. 1010, 1011 (Bkrtcy. S.D.N.Y.1982); *In re Ardmore Sales Co., Inc.,* 22 B.R. 911, 913 (Bkrtcy.E.D.Pa.1982); *In re Mindy's, Inc.,* 17 B.R. 177, 179, 5 C.B.C.2d 1451 (Bkrtcy.S.D.Ohio 1982); *In re Sportsco, Inc.,* 12 B.R. 34, 35–36, 7 B.C.D. 1025 (Bkrtcy.D.Ariz.1981); *Matter of Duffy, supra,* 3 B.R. at 265.

In *In re Larson,* 21 B.R. 264, 267 n. 2 (Bkrtcy.D.Utah 1982), this Court held that in computing the preference period the date of filing the bankruptcy petition should be excluded, and the 90 day period calculated beginning with the day prior to filing as the first day and counting back until the 90th day. *Cf.* 4 COLLIER ON BANKRUPTCY, *supra* ¶ 547.28, at 547–109; 2 W. NORTON *supra* § 32.11. By applying the *Larson* computation and counting back, the preference period extends to June 18, 1981. The undisputed facts show that the July checks were both received by the defendants and honored on or after July 10, 1981.

The monthly payments to investors were made by the "payable companies," i.e., Accounting Services Company, Payable Accounting Company, and Tonder Payable Service Company, which were intermediaries through which the Clearing Houses paid their investors. Orders for relief were granted to the debtors herein under Chapter 11 as follows:

| Debtor | Date Relief Granted |
| --- | --- |
| Independent Clearing House | September 16, 1981 |
| Universal Clearing House | September 16, 1981 |
| Accounting Services Company | December 17, 1981 |
| Payable Accounting Company | April 29, 1982 |
| Tonder Payable Service Company | August 16, 1982 |

A potential issue exists as to whether the July payments were made within 90 days of the filing of the bankruptcy petitions, since orders for relief were not entered against the payable companies until outside of the 90 day period. However, the undisputed facts show that the funds transferred to defendants were at all times owned and under the custody and control of Independent Clearing House and Universal Clearing House. Affidavit of Ron N. Bagley in Support of Trustee's Amended Motion for Summary Judgment at ¶ 22 (Feb. 24, 1984). Mere circuity of arrangement will not save a transfer which effects a preference from being invalid as such. *Dean v. Davis, supra,* 242 U.S. at 443. *See National Bank of Newport v. National Herkimer County Bank,* 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912); *Dodson v. Lumpkin,* 205 F.Supp. 352, 355 (W.D.Va.1962); 4 COLLIER ON BANKRUPTCY, *supra,* ¶ 547.09, at 547–33 to 547–34; *In re Stop-N-Go of Elmira, Inc.,* 30 B.R. 721, 726 (Bkrtcy.W.D.N.Y.1983) ("An indirect transfer is preferential if the intermediary acts as representative of the insolvent and complying with the insolvent's direction, pays the money to or for the benefit of the creditor."). I therefore find that the transfers to defendants satisfy the requirement of 11 · U.S.C. § 547(b)(4)(A).

(6) *That Enables the Creditor to Receive More Than He Would Receive Under Chapter 7.* Element six of a preference requires a showing that the effect of the transfers was to enable defendants to receive more than they would have received had the estate been liquidated and the July payments not been made. *See* 11 U.S.C. § 547(b)(5); *Barash v. Public Finance Corp.,* 658 F.2d 504, 508–09 (7th Cir.1981);

*Matter of Ocobock,* 608 F.2d 1358, 1360 (10th Cir.1979).

 Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among its creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results. *Palmer Clay Products Co. v. Brown,* 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655, 657 (1936). *See* 2 G. Glenn, FRAUDULENT CONVEYANCES AND PREFERENCES § 401, at 688 (rev. ed. 1940). To make this determination, the court must construct a hypothetical liquidation of the debtor's estate. *Matter of Hale,* 15 B.R. 565, 567, 8 B.C.D. 434, 5 C.B.C.2d 759 (Bkrtcy.S.D.Ohio 1981). The costs of administration of the debtor's estate are to be taken into account in making the "receive more" determination. *In re Schindler,* 223 F.Supp. 512, 529 (E.D.Mo.1963). The court need only determine that the preferred creditor, if paid to the extent provided by the Bankruptcy Code, would receive less than 100 percent of its claim. Any dividend less than 100 percent insures that, unless the transfer is avoided, the creditor would receive more than it would receive if paid to the extent provided by the distributive provisions of Chapter 7. *In re Saco Local Development Corp.,* 30 B.R. 862, 865–66 (Bkrtcy.D.Me.1983). *See* 1983 Ann. Surv.Bankr.L. 662.

 Turning to the trustee's proof, it appears that approximately 924 investors, who invested sums aggregating more than 4 million dollars, received no returns and lost all of their original investment. Affidavit of Ron N. Bagley in Support of Trustee's Amended Motion for Summary Judgment at ¶ 30 (Feb. 24, 1984). It is true that the trustee has not constructed a hypothetical distribution to demonstrate what percentage of their debts the investors will likely recover in this case. From a practical standpoint, it is doubtful whether this is possible in the situation, as here, where all of the assets of the estate consist of contingent recoveries from the trustee's litigation. But it is perfectly clear on the evidence presented that there will not be a 100 percent dividend to creditors. In a summary judgment proceeding, the court is not precluded from taking judicial notice of the record in the case. When we consider that 924 investors have claims exceeding four million dollars, for which they received nothing, scheduled claims for principal and unpaid interest total more than 50 million dollars, most of the administrative expenses allowed by this Court, which exceed $600,000.00, have not been paid, the liquid assets of the debtors' estate have never exceeded $150,000.00, and the United States claims substantially all of the assets sought to be recovered by the trustee under the criminal forfeiture provisions of the R.I.C.O. statute,[25] it is perfectly clear that the July payments enabled defendants to receive more than they would under Chapter 7. Accordingly, I find that the requirements of Section 547(b)(5) have been met.

Based on these facts, the Court is compelled to conclude that all of the elements of a preferential transfer exist with respect to the July, 1981, payments to defendants. The only issue remaining for consideration is defendants' contention that the "ordinary course of business" exception shields these payments.

*The Ordinary Course of Business Exception*

Defendants strenuously argue that even if the elements of a preference under Section 547(b) are present, their July payments are immune from the trustee's attack un-

---

**25.** 18 U.S.C. §§ 1961, *et seq. See* Blakey & Gettings, "Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies," 53 Temple L.Q. 1009–48 (1980). The indictment, *see* note 4, *supra,* identifies property subject to forfeiture under 18 U.S.C. § 1963(a)(1), which provides:

(a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962.

der the exception found in Section 547(c)(2), which provides:

> (c) The trustee may not avoid under this section a transfer—
>
> (2) to the extent that such transfer was—
>
> (A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;
>
> (B) made not later than 45 days after such debt was incurred;
>
> (C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>
> (D) made according to ordinary business terms;

In so arguing, defendants seem to rely exclusively on *In re Iowa Premium Service Co., Inc.*, 695 F.2d 1109 (8th Cir.1982). In that case, the Eighth Circuit, sitting *en banc*, reversed its three-judge panel and held that monthly interest payments under a loan agreement were "incurred" for purposes of Section 547(c)(2)(B) each month as they fell due, not on the date the loan was made. Defendants analogize their monthly "interest" payments to the loan payments in *Iowa Premium* and contend that because the payments were made within 45 days after the debt was incurred, they fall within the statutory exception to preference liability.

While "ordinary course of business" is not expressly defined in the Bankruptcy Code, it appears that the purpose of Section 547(c)(2) was to protect from preference liability ordinary trade credit transactions that are kept current, including payment of monthly utility bills. S.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978), 1978 U.S. Code Cong. & Admin.News, p. 5874; H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 373 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6329; Levin, "An Introduction to the Trustee's Avoiding Powers," 53 Am. Bankr.L.J. 173, 186 (1979); Clark, "Preferences Under the Old and New Bankruptcy Acts," 12 U.C.C.L.J. 154, 163 (1979). After removing the "reasonable cause to believe the debtor was insolvent" element of former preference law, Congress found in Section 547(c)(2) a means to protect normal financial relations between the debtor and its creditors. *See Matter of Kennesaw Mint, Inc.*, 32 B.R. 799, 804–05 (Bkrtcy.M. D.Ga.1983).[26]

Reading the ordinary course of business exception in the light of the purpose behind Section 547(c)(2), it is clear that Congress did not intend to protect one group of investors in a "Ponzi" scheme over the rest. In rejecting defendants' argument that the ordinary course of business exception applies to these transfers, it is not necessary for me to decide the question of whether or not the rule of *Iowa Premium* should be followed. Unlike *Iowa Premium*, this case may be resolved under Section 547(c)(2)(C) and (D).[27]

▇▇ Defendants bear the burden of proving each of the four elements of the Section 547(c)(2) exception. *Matter of Richter & Phillips Jewelers & Distributors, Inc.*, 31 B.R. 512, 515 (Bkrtcy.S.D. Ohio 1983); *In re Saco Local Development Corp.*, 25 B.R. 876, 879 (Bkrtcy.D.Me.1982). There is nothing in the evidence to indicate that these payments were in the ordinary course of business of the debtors and the defendants and made according to ordinary business terms.

▇▇ When these transactions are considered for what they actually were, irrespective of what the investors thought they were, these payments could not constitute transfers in the ordinary course of business of the debtors and made according to ordinary business terms. All of the trans-

---

26. It was predicted that the "ordinary course of business" exception would emerge as a popular defense against preference actions by a trustee. *See* Macey, "Preferences and Fraudulent Transfers Under the Bankruptcy Reform Act of 1978," 28 Emory L.J. 685, 692–93 (1979).

27. In *Iowa Premium*, the parties stipulated that the debt was incurred in the ordinary course of business and the interest payments were made in the ordinary course of business and according to ordinary business terms. *See Matter of Iowa Premium Service Co., Inc.*, 12 B.R. 597, 599 (Bkrtcy.S.D.Iowa 1981).

actions were unusual, extraordinary, and unrelated to any business enterprise whose protection was intended by the drafters of Section 547(c)(2).

In sum, and for the reasons stated, the July payments to defendants are preferential transfers not falling within any recognized exception. Accordingly, judgment shall be entered for the trustee on his first cause of action.

*Prejudgment Interest*

The trustee contends that he is entitled to an award of prejudgment interest from the date of each transfer avoided in this proceeding. This Court disagrees.

■ There appear to be no reported decisions under the Bankruptcy Code which have considered the availability of prejudgment interest in actions to recover fraudulent conveyances. The Bankruptcy Code itself is silent on the subject. However, Collier suggests that, as under prior law, the bankruptcy court should exercise its equitable powers to award the trustee interest and costs. 4 COLLIER ON BANKRUPTCY ¶ 550.02, at 550–56 (15th ed. 1984). Ordinarily, the allowance of prejudgment interest and the fixing of the time from which interest shall accrue are discretionary with the court.

■ An award of prejudgment interest is not punitive but compensatory, and is allowed where necessary to make the prevailing party whole. *See Uinta Pipeline Corp. v. White Superior Co.,* 546 P.2d 885 (Utah 1976); *Fell v. Union Pacific Railway Co.,* 32 Utah 101, 88 P. 1003, 1005–07 (1907). *Cf. First Security Bank of Utah v. J.B.J. Feedyards,* 653 P.2d 591, 599–600 (Utah 1982).

■ It is well settled that in an action to set aside a preference the trustee is entitled to prejudgment interest from the date of demand for its return, or, in the absence of a prior demand, from the date of commencement of the adversary proceeding. *See Kaufman v. Tredway,* 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *Palmer v. Radio Corporation of America,* 453 F.2d 1133, 1140 (5th Cir.

1971); *Salter v. Guaranty Trust Company of Waltham,* 237 F.2d 446, 447–48 (1st Cir.1956); *Roth v. Fabrikant Bros., Inc.,* 175 F.2d 665, 669 (2d Cir.1949); *Waite v. Second National Bank of Belvidere, Ill.,* 168 F.2d 984, 987–88 (7th Cir.1948); *Manufacturers' Finance Co. v. Marks,* 142 F.2d 521, 528 (6th Cir.), *cert. denied,* 323 U.S. 721, 65 S.Ct. 52, 89 L.Ed. 579 (1944); *Plymouth County Trust Co. v. MacDonald,* 60 F.2d 94, 95, 97 (1st Cir.1932); *Elliotte v. American Sav. Bank & Trust Co.,* 18 F.2d 460, 462 (6th Cir.1927); *In re Roco Corp.,* 37 B.R. 770, 774 (Bkrtcy.D.R.I. 1984); *Matter of Craig Oil Co.,* 31 B.R. 402, 409 and n. 7 (Bkrtcy.M.D.Ga.1983); 3 COLLIER ON BANKRUPTCY ¶ 60.63[1], at 1129 (14th ed. 1977); Annot., *Interest on Preferential Payment Recovered by Trustee in Bankruptcy,* 4 A.L.R.2d 327 (1949).

■ The allowance of interest from the date demand is made or a proceeding instituted, rather than the date of the transfer, is based on the idea that until such time the preferred creditor cannot be said to hold the property wrongfully. *See Utah Association of Credit Men v. Boyle Furniture Co.,* 43 Utah 523, 136 P. 572, 576 (1913). A transaction which results in a voidable preference is lawful when made but subject to the possibility of being defeated by subsequent events. It continues to be lawful unless it is followed by the filing of a bankruptcy petition within 90 days. It continues to be lawful after that time unless the trustee elects to avoid it. Until the trustee exercises his election and makes demand for the transfer, the creditor's possession of the property is proper. Similar considerations lead me to conclude that in the case of fraudulent conveyances under Section 548(a)(2) prejudgment interest should be allowed from commencement of the suit.

■ It is recognized that where transfers are made with actual intent to hinder, delay, or defraud creditors, or the transferee is guilty of culpable misconduct, prejudgment interest may be awarded from the date of the transfer. *See Jackson v.*

*Star Sprinkler Corp. of Florida*, 575 F.2d 1223 (8th Cir.1978) (transferee participated in fraudulent conspiracy); *Gould v. Nathans*, 1 F.2d 458, 459 (D.Mass.1924) (evidence of fraud); *Simpson v. Western Hardware and Metal Co.*, 227 F. 304 (W.D. Wash.1915) (trustee's complaint to recover value of goods fraudulently transferred, together with interest from date of transfer, sustained against defendant's motion to strike); *Matter of Wholesale Furniture Mart, Inc.*, 24 B.R. 240, 244 & n. 8 (Bkrtcy. W.D.Mo.1982) (conversion). For voidable postpetition transfers, prejudgment interest generally runs from the date of the transfer. *See Kass v. Doyle*, 275 F.2d 258 (2d Cir.1960); *Manufacturers' Finance Co. v. Marks*, 142 F.2d 521 (6th Cir.1944); *In re P & Z Island Farms, Inc.*, 478 F.Supp. 529 (S.D.N.Y.1979). Neither a voidable preference nor a fraudulent conveyance under Section 548(a)(2) involves any fraudulent intent on the part of the transferee. They are not transactions evil in themselves but prohibited by the Bankruptcy Code in the interest of promoting equal treatment among creditors. Defendants' acceptance of their payments was not prohibited. Defendants did not know and could not foresee that their payments constituted preferences and fraudulent conveyances that were voidable by the bankruptcy trustee.

In *Robinson v. Watts Detective Agency*, 685 F.2d 729, 741–42 (1st Cir.1982), the Court of Appeals for the First Circuit approved the rule that prejudgment interest should be allowed from the date of commencement of the action, but declined to allow it in a proceeding to recover a fraudulent conveyance under former 11 U.S.C. § 107(d)(2), the predecessor of Section 548(a)(2), because the property conveyed, namely the company's customer accounts

and goodwill, did not have a definite and ascertainable value.

Based upon the foregoing, the Court holds that in the absence of actual fraud or an extraordinary fact situation warranting otherwise, prejudgment interest in an action to recover a fraudulent conveyance under Section 548(a)(2) should be allowed from the time a demand is made upon the transferee, and in the absence of such a demand, from the date of commencement of a suit to recover the same. Therefore, the trustee is entitled to prejudgment interest at the legal rate on his first and second causes of action from September 15, 1983.

*Allowance of Defendants' Claims*

As a separate cause of action, the trustee has asked that claims filed by the defendants be denied unless and until their preferences or fraudulent conveyances are surrendered.[28] Section 502(d) of the Code provides:

> (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550 or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of this title, unless such entity of transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

The legislative history indicates that Section 502(d) continues the requirement under Section 57(g) of the 1898 Bankruptcy Act and "requires disallowance of a claim of a transferee of a voidable transfer in toto if the transferee has not paid the amount or turned over the property re-

---

**28.** A principal function of the bankruptcy process is to deal with the allowance of claims against the debtor. Bankruptcy Rule 3007 provides:

> An objection to the allowance of a claim shall be in writing and filed with the court. A copy of the objection with notice of the hearing

thereof shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession and the trustee at least 30 days prior to the hearing. If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding.

ceived as required under the sections under which the transferee's liability arises." H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 354 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6310; S.Rep. No. 95–989, 95th Cong., 2d Sess. 65 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5851. Once the liability of a transferee has been determined, the claim interposed by the transferee will be disallowed unless such transferee gives effect to the judgment and surrenders the avoided transfer. 3 COLLIER ON BANKRUPTCY ¶ 502.04, at 502–78 (15th ed. 1984).

 Unavoidably, and by the very terms of Section 502(d), when the trustee objects to a claim upon the ground that the claimant has failed to surrender a voidable transfer, the claim can neither be allowed nor disallowed until the validity of the transfer is adjudicated. *See Katchen v. Landy,* 382 U.S. 323, 330, 86 S.Ct. 467, 473, 15 L.Ed.2d 391 (1966). The allowance of claims may properly be decided in a motion for summary judgment. *See Matter of Moses,* 9 B.R. 370, 7 B.C.D. 413 (Bkrtcy.N.D. Ga.1981).

 In passing on the allowance of claims, the bankruptcy court sits as a court of equity, clothed with the powers to sift through the circumstances surrounding any claim to see that injustice and unfairness are not done in the administration of the debtor's estate. *Central States Corp. v. Luther,* 215 F.2d 38, 46 (10th Cir.1954). *See Pepper v. Litton,* 308 U.S. 295, 304–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939). The bankruptcy court is empowered to attach appropriate conditions to the allowance of claims, including the power to require the claimant to surrender his preference or fraudulent conveyance before allowing his claim. *Inter-State National Bank of Kansas City v. Luther,* 221 F.2d 382, 389 (10th Cir.1955); *Central States Corp. v. Luther, supra,* 215 F.2d at 46.

 Many of the defendants who received fraudulent conveyances under the trustee's second cause of action and voidable preferences under his first cause of action have filed claims against the debtors' estate. These defendants' claims are not allowable pursuant to Section 502(d) until after their fictitious profits and preferences have been surrendered to the estate. However, the Bankruptcy Code does not penalize these defendants for not surrendering the funds voluntarily by forfeiting their claims. By satisfying the judgment rendered in accordance with this memorandum opinion, the defendants may have their claims allowed on an equal footing with other creditors. *See* 3 COLLIER ON BANKRUPTCY ¶ 57.19 2 at 208 (14th ed. 1977).

Accordingly, the Court holds that the claims filed by defendants who received preferences or fraudulent conveyances under the trustee's first and second causes of action shall be disallowed. However, upon timely surrender of such funds to the trustee, the order of disallowance will be vacated on motion of a party in interest.

## CONCLUSION

The present adversary proceeding is perhaps the first since the enactment of the Bankruptcy Code to consider the scope of the trustee's avoiding powers as against the victims of a "Ponzi" scheme. Although much about the operation and business of the Clearing Houses and the activities of their former principals remains obscure, and may long remain obscure, I can entertain no doubt, after the most careful study and dispassionate judgment of which I am capable, that the fundamental facts upon which the trustee's suit against the investors is predicated have been established.

Upon a thorough review of the relevant legal authorities, I am fully convinced that the trustee's third cause of action fails to state a claim against the investors. No case is on record where such recovery was allowed, and when we reflect on the equities involved we are driven to conclude that it would be manifestly unjust to extend to new frontiers the hazards of investing in fraudulent schemes.

The Court further concludes that the transfers to each defendant in excess of his or her investment were for less than a reasonably equivalent value and, therefore, constitute fraudulent conveyances under 11 U.S.C. § 548(a)(2). Judgments will be entered for the trustee on his second cause of action against such defendants, with prejudgment interest from the commencement of this proceeding. It is also clear that the July payments are preferences under Section 547(b) of the Bankruptcy Code. The trustee is therefore entitled to judgment on his first cause of action, with prejudgment interest from the commencement of this proceeding.

Counsel for defendants are to submit proposed orders consistent with their respective portions of this opinion within ten days. Counsel for the trustee is directed to prepare and present proposed judgments on the first and second causes of action in conformity with this opinion within ten days. Counsel for the trustee shall also submit an appropriate form of order disallowing claims in accordance with the foregoing.